*629 OPINION OF THE COURT
Timothy J. Walker, J.
On March 24, 2005 defendant Julianne Hughes borrowed $72,000 from Argent Mortgage Company, LLC and signed a promissory note (note) requiring her to make monthly payments to Argent commencing on May 1, 2005 and ending on April 1, 2035. This debt is secured by a mortgage on Hughes’ real property located in the Town of Hamburg, New York (mortgage), recorded in the Erie County Clerk’s Office on March 24, 2005 in liber 13218 of mortgages at page 8094. Thereafter, Hughes defaulted on the loan, and on April 13, 2009 plaintiff Wells Fargo Bank, N.A. commenced this foreclosure action.
The complaint alleges that Wells Fargo is “the owner and holder of the subject mortgage and note, or has been delegated the authority to institute a mortgage foreclosure action by the owner and holder of the subject mortgage and note.” Wells Fargo, however, has failed to attach a copy of an applicable assignment of mortgage and note, assuming one exists. Nor has Wells Fargo submitted an affidavit of merit from a representative of Wells Fargo, with knowledge, attesting to the delivery of the note and mortgage to Wells Fargo prior to the commencement of this action. Similarly, in the event Wells Fargo did not own the note and mortgage at the commencement of this action, Wells Fargo has failed to submit a power of attorney from the holder of said mortgage and note, authorizing it to proceed with the action. Accordingly, Wells Fargo has not established that it has standing to commence this action. (See Mortgage Elec. Registration Sys., Inc. v Coakley, 41 AD3d 674 [2d Dept 2007]; see also HSBC Bank USA, N.A. v Cherry, 18 Misc 3d 1102[A], 2007 NY Slip Op 52378[U] [Sup Ct, Kings County 2007].) The instant mortgage is a subprime adjustable rate mortgage (ARM) loan. According to the note, Hughes was required to pay principal and interest in the amount of $520.81 per month for the first three years at 7.85%. Then, on April 1, 2008 and every six months thereafter, the interest rate could change on the “change date,” based upon an “index” that is “the average of interbank offered rates for the six-month U.S. dollar-denominated deposits in the London market (‘LIBOR’), as published in The Wall Street Journal.” The specific terms of the Hughes note provide that the new interest rate would be the LIBOR rate, 45 days prior to the “change date,” plus 6%, rounded to the nearest .125%. The interest rate could increase up to 1% on each “change date,” but the note capped the *630 adjusted interest rate at 13.85% and set 7.85% as the floor if rates decreased.
As shown below, ARM loans have been universally condemned both nationally and by the New York State Legislature, as contributing to the start of the current foreclosure crisis and its perpetuation into the reasonably foreseeable future.
U.S. Senator Christopher Dodd (D-Connecticut), Chairman of the Senate Committee on Banking, Housing and Urban Affairs, in his opening statement at the March 22, 2007 Committee hearing on Mortgage Market Turmoil: Causes and Consequences, stated that “[o]ur mortgage system appears to have been on steroids in recent years, giving everyone a false sense of invincibility” (available at http://banking.senate.gov/public/ index.cfm?FuseAction=Newsroom.PressReleases&ContentRecord_id=C8688175-E082-4560-861B-DA646898432A). He went on to strongly criticize ARM loans, referring to them as “unconscionable and deceptive”:
“The subprime market has been dominated in recent years by hybrid ARMs, loans with fixed rates for 2 years that adjust upwards every 6 months thereafter. These adjustments are so steep that many borrowers cannot afford to make the payments and are forced to refinance, at great cost, sell the house, or default on the loan. No loan should force a borrower into this kind of devil’s dilemma. These loans are made on the basis of the value of the property, not the ability of the borrower to repay. This is the fundamental definition of predatory lending.
“Frankly, the fact that any reputable lender could make these kinds of loans so widely available to wage earners, to elderly families on fixed incomes, and to lower-income and unsophisticated borrowers, strikes me as unconscionable and deceptive.” (Id.)
In the August 26, 2009 on-line edition of the New York Times (Leland, Loans That Looked Easy Pose Threats to Recovery, available at http://www.nytimes.com/2009/08/27/us/ 27arms.html), Elena Warshawsky, a residential credit analyst with Barclays Capital, described ARM loans as,
“a loan meant for sophisticated investors, or people who expected their cash flow to increase over time ....
“But then they were extended to all sorts of buyers. *631 Now it wasn’t people hoping their income would grow. It was people hoping their house price would increase so they could refinance or sell [their home]” (internal quotation marks omitted).
The article also reported that Barclays Capital expects 81% of ARM loans originated in 2007 to default and that many economists characterize ARM loans as “a looming threat to a housing recovery” because more than a half million of them are “scheduled to reset in the next four years, at rates many homeowners cannot afford.” (Id.)
New York State’s view of ARM loans is similarly critical.
“HALT” is New York State Governor David A. Paterson’s Interagency Task Force to Halt Abusive Lending Transactions. In a report, dated December 31, 2008, submitted by Richard H. Neiman, New York Superintendent of Banks (HALT report, available at http://www.banking.state.ny.us/pr081231.pdf), it is noted that “[adjustable rate mortgages and nontraditional loans such as interest-only products have been a particular contributor to the foreclosure crisis, as rates reset or loans begin to amortize and many borrowers face payment shock.” (Id. at 11.) The HALT report went on to state that subprime loans were the “primary driver” behind the increase in the percentage of loans 90 or more days past due as of the third quarter of 2008:
“According to the Mortgage Banker’s National Delinquency Survey, the percent of loans 90 or more days past due continues to increase across the board. The trends were starker for loans categorized by the survey as ‘seriously delinquent,’ which includes the 90 or more day past due category and loans in the foreclosure process. Subprime adjustable rate loans were the primary driver, with nearly one-third of such loans [in New York] listed as seriously delinquent during the third quarter of2008. This exceeds the rate for the nation.” (Id. at 12 [internal table omitted; emphasis added].)
According to the HALT report, New York participates in the State Foreclosure Prevention Working Group, which is a cooperative dialogue between state officials across the nation and mortgage servicers that began in 2007. Since October 2007, the Working Group has been collecting data from the largest subprime mortgage servicers, with 13 of the largest 20 servicers participating. The Working Group issued a report, dated September 29, 2008, which indicates “that industry measures *632 to keep homeowners out of foreclosure have slipped, and are failing to keep pace with the increasing rate of loan delinquencies.” (Id. at 38.)
The New York State Legislature has also criticized ARM loans. Last year, both houses sponsored an amendment to Tax Law § 250, which would eliminate the mortgage tax for people who refinanced their home from an ARM loan. In their respective sponsoring memoranda, the State Assembly and State Senate referred to ARM loans as constituting “shady lending practices”:
“This lending crisis has been fed by adjustable-rate mortgages and other shady lending practices that often offer low initial teaser rates that then skyrocket after a period of time. The increase in rates which occur unannounced raises the amount homeowners pay each month ....
“This legislation will eliminate the mortgage tax for people who were victims of this sub-prime mess and refinanced from an adjustable rate to a fixed rate.” (Assembly Mem in Support, 2009 NY Assembly Bill A7705 [Apr. 25, 2009]; Senate Introducer Mem in Support, 2009 NY Senate Bill S2073 [Mar. 14, 2009].)
The proposed amendment remains pending.
In 2008, New York enacted comprehensive subprime lending reform legislation. (See L 2008, ch 472.) One of the new laws added by such legislation included CPLR 3408. Pursuant to CPLR 3408, for residential foreclosure actions involving a high-cost home loan created between January 1, 2003 and September 1, 2008, or a subprime, or nontraditional loan where the defendant is a resident of the property, the court must hold a voluntary conference within 60 days after the date proof of service of the foreclosure is filed with the county clerk, or on an adjourned date agreed to by the parties, if the defendant homeowner requests a conference. Section 3408 is applicable to this case and this court held several conferences with the parties in accordance with it. While this court has interpreted CPLR 3408 as requiring the parties to act in good faith during the mandatory settlement conference process, in late 2009, the State Legislature amended CPLR 3408 to expressly require that they negotiate in good faith. In sponsoring such legislation, both the State Assembly and State Senate found that “[a]s the mortgage crisis has worsened ... it has become evident that more must be accomplished to protect New Yorkers in these difficult times and *633 beyond.” (Assembly Mem in Support, Bill Jacket, L 2009, ch 507; Senate Introducer Mem in Support of L 2009, ch 507, 2009 McKinney’s Session Laws of NY, at 1839.)
Moreover, while there are no allegations that Hughes is a minority or that her home is located in a minority area, it is telling that at least one court has determined that a mortgage granted to a minority buyer for the purchase of property in a minority area, which carries an interest rate exceeding 9%, creates a rebuttable presumption of discriminatory practice. (M & T Mtge. Corp. v Foy, 20 Misc 3d 274 [Sup Ct, Kings County 2008].)
It is against this universal condemnation of ARM loans and their contributory role in the current foreclosure crisis that this court evaluates Wells Fargo’s conduct in this case.
Commencing on August 13, 2009, and through the end of October 2009, this court conducted several conferences with counsel for the parties, pursuant to CPLR 3408. The conference process concluded with Wells Fargo offering Hughes a proposed loan modification agreement, dated October 27, 2009 (the modification agreement), which included, inter alia, the following terms:
Interest rate: An initial interest rate of 7.85% for the first five years of the modified loan, but, thereafter, rate changes would resume in accordance with the terms of the original note. Not surprisingly, Hughes objected to the proposed modification agreement because it included an ARM. This court informed Wells Fargo that it rejected the ARM and directed Wells Fargo to offer Hughes a modification agreement that included a fixed interest rate. Wells Fargo refused to do so.
Amounts past due to be capitalized: As of October 27, 2009, Wells Fargo determined that Hughes owed it $24,414.65 in arrears, which it agreed to recapitalize into the modified loan. Included in this amount were unspecified “corporate advances” of $3,708.02 and an unexplained charge of $5,562 identified as “OSFC.”
Amortization term: The amortization term did not change and the loan, as proposed to be modified, would have matured on April 1, 2035 as set forth in the original note. Wells Fargo’s refusal to extend the term resulted in a monthly principal and interest payment in the modification agreement, commencing on November 1, 2009, of $703.67, as compared to the monthly *634 payment of $520.81, which Hughes was required to pay commencing on May 1, 2005 in accordance with the original note. The required monthly payment of $703.67, which does not reflect any upward adjustments created by the adjustable rate provision, was approximately 35% higher than the note’s original monthly payment of $520.81, which Hughes could not afford.
It is well settled that a plaintiff seeking equitable relief, such as Wells Fargo in the instant foreclosure action, has the burden of satisfying the requisites of equity by coming to court with “clean hands.” (Dunn v Moss, 64 AD2d 838 [4th Dept 1978]; see also M & T Mtge. Corp. v Foy at 275.) The terms of the proposed modification agreement, particularly but not exclusively the inclusion of an adjustable rate component, are unacceptable to this court. The proposed modification agreement flies in the face of the above-described legislation passed in 2008 and in December of 2009, which was designed to assist borrowers in foreclosure cases to remain in their homes and to prevent a foreclosure crisis like the one currently gripping this state and the nation from reoccurring in the future. Moreover, Wells Fargo has acted in bad faith and contrary to CPLR 3408 by presenting Hughes with the modification agreement described above and, notwithstanding the court’s directive, obstinately refusing to revise its terms in accordance with the stated intention of the Legislature.
For the reasons stated herein, it is hereby ordered, that the above matter is hereby dismissed, without prejudice; and it is further ordered, that in the event Wells Fargo commences a new action in foreclosure with respect to this borrower and the premises at issue herein, no additional costs or attorney fees will be allowed, absent good cause shown.