OPINION OF THE COURT
Jeffrey Arlen Spinner, J.
On July 23, 2009 plaintiff commenced this action claiming foreclosure of a mortgage by filing its notice of pendency and summons and complaint with the Clerk of Suffolk County. The mortgage at issue was given by defendants to plaintiff on July 5, 2007, in the principal amount of $302,500, and was recorded with the Clerk of Suffolk County in Liber 21580 of Mortgages at page 379. Said mortgage was given as collateral security for a simultaneously executed adjustable rate note with interest at the initial rate of 11.625% and it constitutes a first lien upon premises known as 66 Circle Drive, East Northport, Town of Huntington, New York.
On or about May 1, 2008, owing to a loss of employment, defendants defaulted upon their monthly installment payments due to plaintiff under the adjustable rate note. According to defendants, they had, from the very time of default, assiduously attempted to arrive at an amicable resolution but were met with multiple and varying impediments erected by plaintiff. They claim to have been ceaselessly trying since the default date, albeit without any success, to obtain a modification from plaintiff, having proceeded on their own, thence through a modification facilitator and finally through counsel. Plaintiff baldly asserts that defendants only sought to resolve this matter subsequent to the commencement of the foreclosure action, *163 a position that is belied by the record. Though plaintiff advances no explanation whatsoever for the 14-month hiatus between default and suit, its actions, when considered in light of all of the circumstances herein, lead inexorably to the conclusion that this gap in time would indubitably increase the amount of interest plaintiff could exact from defendants, hardly a noble or good faith purpose.
On or about August 3, 2009, initial process was served upon defendants and thereafter counsel appeared and interposed a verified answer on their behalf. By notice of motion dated October 14, 2009 (motion sequence No. 001) which was returnable October 28, 2009, plaintiff applied to this court for an order granting summary judgment pursuant to CPLR 3212 and for the appointment of a referee to compute in accordance with RPAPL 1321. Thereafter, and on October 18, 2009, the first in what evolved into a series of foreclosure settlement conferences was convened. The same was adjourned on no less than five occasions and was ultimately referred to the undersigned by Court Attorney Referee Adrienne Williams, Esq., notwithstanding the vociferous and inexplicable objections of plaintiffs counsel. A conference was then held by the court on March 16, 2010 and the entire proceeding was thereafter adjourned for all purposes to April 27, 2010.
A careful examination of all of the documentation submitted by plaintiff, both on its motion and at the conference, is, at the same time, both starkly revealing and greatly disturbing. While the adjustable rate note contains an initial interest rate of 11.625% it is subject to change on August 1, 2012 and on the first day of each succeeding August thereafter, until its stated maturity date of August 1, 2037. The basis upon which the interest rate is computed is set forth at some length within paragraph four of the adjustable rate note. Briefly stated, it provides that the holder will determine the rate based upon the average weekly yield on securities issued by the United States Treasury as adjusted to a constant maturity of one year, to which it will then add 6.375% followed by a rounding of the same upward to the nearest one eighth of one percent. Appended thereto (and likewise annexed to the recorded mortgage) is a document entitled “Default Interest Rate Rider” which, by its express terms, modifies the adjustable rate note by providing for an upward increase in the rate of interest charged to 18% upon a default by the mortgagors. The default interest rate is triggered by any one of the events of default as they are defined in the adjustable rate note and mortgage.
*164 Though not expressly stated, this court, being fully aware of the customs and practices extant in the mortgage lending industry (including loan origination, warehousing, brokerage, closing, settlement and transfer), must presume that the terms and conditions of the adjustable rate note, default interest rate rider and mortgage were the product of unequal bargaining power as between plaintiff and defendants. It is a virtual certainty that defendants were not afforded the opportunity to freely bargain and negotiate in reaching the operative terms that are now subject to this court’s scrutiny. Since the instruments upon which plaintiff demands enforcement have obviously been promulgated by the lender to the borrowers and since the operative and binding terms thereof are clearly not negotiable by the borrower, such instruments must be considered to be in the nature of a contract of adhesion, which typically would be construed against the drafter thereof (Belt Painting Corp. v TIG Ins. Co., 100 NY2d 377 [2003]).
On March 16, 2010, in accordance with the provisions of CPLR 3408, a mandatory foreclosure settlement conference was convened before the court. Present at that conference were defendants, their counsel Sean C. Serpe, Esq., Millie Rivera, as a representative of plaintiff, and plaintiffs counsel Joshua Deutsch, Esq. One of the items produced at that conference was a document entitled “Loan Modification Agreement,” which had been propounded by plaintiffs counsel on or about February 23, 2010 and which required an acceptance thereof not later than March 5, 2010 else the offer be revoked and the foreclosure action be continued. This agreement was intended to effectuate a cure of the arrears over time together with a myriad of other provisions. The amount or arrears to be cured was determined by plaintiff to total $119,330.89 with the sum of $84,606.45 to be recapitalized at the rate of 6%. Plaintiff proposed that if the agreement were fully consummated, after 12 months it would “forgive” default interest of approximately $30,000.
According to plaintiff, the principal balance owed stands at $301,721.58 and the interest accrued between May 1, 2008 and March 1, 2010 has reached the not insubstantial sum of $95,154.65 with a continuing per diem of $132.54 thereafter. According to both Ms. Rivera and attorney Deutsch, interest was computed at 16% per annum in accordance with the default interest rate rider described, supra (which, as previously noted, actually provides for default interest to be computed at the rate of 18% an inconsistency that remains unexplained). In addition *165 to interest, plaintiff also claimed the sum of $19,672.91 for “Other Charges” which plaintiff declined to explain to defendants or their counsel. Upon questioning by the court, it was revealed that these so-called “Other Charges” consisted of some $1,100 in pre-action late charges, unsubstantiated tax and insurance advances of $10,000, check fees of $40, legal expenses of $3,380, unpaid legal expenses of $4,515 (total claimed legal expenses of $7,895), property inspection fees of $85, unpaid inspection fees of $40 and appraisal fees of $350.
The court questions the entitlement of plaintiff to claim legal fees, costs and accrued interest (especially when computed at a confiscatory rate) inasmuch as not less than 14 months of accruals were due to plaintiffs delay in responding to defendants’ entreaties toward resolution. Plaintiffs position appears to be facially unreasonable.
Although not substantiated, plaintiff asserts that it has advanced the sum of $10,000 for taxes and insurance. According to the Tax Collector of the Town of Huntington, the annual tax upon the property at issue is $3,209.94, of which only the sum of $1,604.97 has been paid for the current levy. According to public records, the taxes for the prior year were $2,709.61. Even so, the affidavit of Joel Marcano, plaintiffs assistant treasurer, avers that as of September 16, 2009, it had paid $6,662.51 for property taxes. These numbers simply do not add up and the amount demanded seems far too round.
In addition, although reasonable legal fees are customarily allowed in a mortgage foreclosure action where provided for in the instruments of indebtedness, the same are subject to an award by the court and, above all, they must be reasonable and fairly related to the work performed. In this matter, the court is convinced that the fees demanded by plaintiff ($7,895) are both excessive and unreasonable, especially in light of the paucity of services that appear to have been performed.
A cursory review of the agreement at the conference revealed some deplorable particulars. In the paragraph enumerated as 1.02, the language was set out in bold type and reads as follows:
“Borrowers unconditionally, knowingly, voluntarily, intelligently, and after having obtained the advice of counsel or having been given ample opportunity to obtain the advi[ce] of counsel and declined to do so, waives any claim, counterclaim, right of recoupment, defenses, affirmative defenses or set-off of any kind or nature whatsoever with respect to the *166 Existing Default, the Loan Documents, and/or the Indebtedness. ”
Further along, in paragraph 2.01, the agreement further provides, in bold and underscored type, that
“Borrowers submit to the jurisdiction of the Court and confirm that all contractual and statutory conditions precedent to such foreclosure proceedings have been satisfied . . . BORROWERS ACKNOWLEDGE THAT ALL PAYMENTS MADE UNDER THIS AGREEMENT ARE MADE WITHOUT PREJUDICE TO THE LOAN ACCELERATION OR THE PENDING FORECLOSURE PROCEEDINGS AND SHALL NOT CONSTITUTE A WAIVER OF ANY OF LENDER’S RIGHTS TO FORECLOSE.”
Continuing on to paragraph 2.02 which prescribes that payments must be received by the first day of each month, without grace period, it states, in pertinent part, that
“Emigrant shall, among other things, be immediately entitled, without any notice to the Borrowers, to exercise any and all remedies available to it and shall be entitled to collect all sums due under the Loan Documents as if this Agreement had not been made . . . the Borrowers shall have no right to cure said default, and Emigrant will be free to pursue all of its rights and remedies under the Loan Documents and this Agreement, at law and at equity.”
Moving along, paragraph 7.10 is intended to function as a general release given by “Borrowers, for themselves and their children, parents, relations” and running in favor of plaintiff “and any entities related to it and its past, present and future directors, officers (whether acting in such capacity or individually), shareholders, owners, partners, joint venturers, principals, trustees, creditors, attorneys, representatives, employees, managers.” This clause, employing broad and sweeping language, releases and discharges the cited releasees from what seems to be every single possible potentiality, including:
“(a) any and all claims for violation of the Truth In Lending Act (‘TILA’), 15 U.S.C. § 1601, et. seq., or its implementing regulations; (b) any and all claims for unfair and/or deceptive trade practices; (c) any and all claims for consumer fraud or for fraudulent and/or predatory lending practices; (d) any and all claims for attorney’s fees and costs of any kind or nature, by statute or otherwise; (e) any and all *167 claims that could have been asserted in any legal proceeding or action; and (f) any and all claims that are relating to, concerning, or underlying the Loan, and the brokering, closing, servicing or administration of the Loan.”
However, nowhere in the agreement is there a parallel release running from plaintiff to defendants. The obvious and facially clear intent of this clause is to circumvent each and every state and federal law in the State of New York intended to regulate the mortgage banking industry.
Perhaps the most distressing section of the agreement is paragraph 7.12, which reads verbatim as follows:
“Borrowers hereby acknowledge, represent and warrant that if they cannot perform in accordance with the terms of this Agreement, they will never be able to perform in accordance with the Loan Documents, nor will they be able to reorganize under the provisions of the United States Bankruptcy Code or any similar law. Accordingly, in consideration of this Agreement and in recognition of Emigrant’s willingness to enter into this Agreement, Borrowers hereby agree that if a petition in Bankruptcy is filed by or against them, as debtor and debtor-in-possession (if applicable), Borrowers hereby consent to immediate and unconditional relief from the automatic stay of 11 U.S.C. § 362 (the ‘Stay’) in favor of Emigrant, waives their right to oppose a motion for relief from the Stay, waives the benefits of the Stay, and hereby admits and agrees that grounds to vacate the Stay to permit Emigrant to enforce its rights and remedies under this Agreement, the Loan Documents and/or any other documents executed in connection therewith exist and shall continue to exist, which grounds include, without limitation, the fact that Emigrant’s interests in the Property cannot be adequately protected.”
This clause, if given legal effect, effectively attempts to deprive defendants of any ability, now or at any future date, to act in a legitimate manner to save their home by invoking the protection of the United States Bankruptcy Code (11 USC § 101 et seq.). The automatic stay is effective upon the filing of a petition in bankruptcy and is imposed pursuant to 11 USC § 362. The automatic stay functions as perhaps the most important tool for the protection of the debtor, the creditors and preservation of the estate. It is abundantly clear that vacatur of the *168 automatic stay is exclusively within the province of the Bankruptcy Court (United States ex rel. Fullington v Parkway Hosp., Inc., 351 BR 280 [ED NY 2006]) and that such a purported waiver of the automatic stay is legally inefficacious (M.E.S., Inc. v M.J. Favorito Elec., Inc., 2010 WL 959604, 2010 US Dist LEXIS 23809 [ED NY, Mar. 15, 2010]). By including this clause, it is clear that were it enforceable, plaintiff would be able to preempt the federal insolvency statutes.
This court has never been presented with such a waiver, especially when accompanied by absurd representations (drafted by the lender) that amount to what could best be described as an express warranty that defendants presently are and will forever be insolvent. It is axiomatic that a pre-bankruptcy waiver of such a valuable statutory right, even if freely bargained for (and in this court’s opinion, this is certainly not the case), should not, under any circumstances, be enforced against consumer debtors such as defendants. In the view of this court, such a highly questionable waiver as this one is unconscionable, unreasonable, overreaching and is absolutely void as against public policy. This is even more glaringly true when the agreement is reviewed in toto and not piece by piece. This court is constrained to determine that the waiver, the release and indeed the agreement as a whole are unacceptable for all purposes.
In 2008, New York’s Assembly and Senate enacted chapter 472 of the Laws of 2008 which constituted a sweeping reform of the laws regarding subprime, high cost and nontraditional home loans. Part and parcel of that legislation included a newly enacted CPLR 3408 which required a mandatory settlement conference in an action to foreclose such a loan. Since its enactment, this court, sitting as the Residential Mortgage Foreclosure Conference Part, has mandated that the parties to such an action act and negotiate in good faith. Indeed, in December of 2009, both the Assembly and the Senate amended CPLR 3408 by, among other things, adding a requirement that the parties act in good faith. Indeed, my learned and distinguished colleague, Justice Timothy J. Walker, in Wells Fargo Bank, N.A. v Hughes (27 Misc 3d 628 [Sup Ct, Erie County 2010]), declined to approve a settlement proposal where the plaintiff failed to act in good faith as required by CPLR 3408. Regrettably, it is patently clear to this court that plaintiff has failed to act in good faith in this matter.
Upon reviewing the totality of the circumstances herein, this court is driven to the inescapable conclusion that plaintiff has, *169 by way of calculation and premeditation (as evidenced by the terms of its carefully crafted agreement), created a scenario whereby it is a virtual certainty that defendants will ultimately be irreparably damaged and further, by way of the agreement, has gone to extraordinary lengths in an attempt to insulate itself from liability while at the same time ensuring that it will not sustain any pecuniary loss and that all costs will be borne by defendants. In short, the conduct of plaintiff in this matter has been overreaching, shocking, willful and unconscionable, is wholly devoid of even so much as a scintilla of good faith and cannot be countenanced by this court.
Since an action to foreclose a mortgage is a suit in equity (Jamaica Sav. Bank v M. S. Inv. Co., 274 NY 215 [1937]), all of the tenets of equity are fully applicable to the proceeding, including the rules governing punitive or exemplary damages (I.H.P. Corp. v 210 Cent. Park S. Corp., 12 NY2d 329 [1963]). Indeed, this court is persuaded that Judge Benjamin Cardozo was most assuredly correct in stating that “[t]he whole body of principles, whether of law or of equity, bearing on the case, becomes the reservoir to be drawn upon by the court in enlightening its judgment” (Susquehanna S.S. Co. v Andersen & Co., 239 NY 285, 294 [1925]). In a suit in equity, the court is vested with jurisdiction to do that which ought to be done. While the court notes that the formal distinctions between an action at law and a suit in equity have long since been abolished in New York (see CPLR 103; Field Code of 1848 §§ 2, 3, 4, 69), the Supreme Court is nevertheless vested with equity jurisdiction and the distinct rules governing equity are still very much applicable (Carroll v Bullock, 207 NY 567 [1913]).
In those rare instances where the conduct of a party is unconscionable, shocking or egregious, a court of equity is vested with the power to award exemplary damages. Exemplary damages may lie in a situation where it is necessary to both effectuate punishment as well as to deter the offending party from engaging in. such reprehensible conduct in the future. Such an award may also be made to address, as so ably enunciated by our Court of Appeals in Home Ins. Co. v American Home Prods. Corp. (75 NY2d 196, 203 [1990]), “gross misbehavior for the good of the public ... on the ground of public policy.” Indeed, exemplary damages are intended to have a deterrent effect upon conduct which is unconscionable, egregious, deliberate and inequitable (I.H.P. Corp. v 210 Cent. Park S. Corp., 12 NY2d 329 [1963]).
Under the unique circumstances of this matter, the court determines that plaintiff be forever barred and prohibited from *170 collecting any of the claimed interest accrued on the loan between the date of default and March 1, 2010, that plaintiff be barred and prohibited from recovering any claimed legal fees and expenses as well as any and all claimed advances to date and further that defendants’ debt be determined at this time to be no more than the principal balance of $301,721.58. The court also determines that the imposition of exemplary damages upon plaintiff is equitable, necessary and appropriate, both in light of plaintiffs shockingly inequitable, bad faith conduct as well as to serve as an appropriate deterrent to any future outrageous, improper and wrongful activities.
The court hereby fixes the amount of exemplary damages in the sum of $100,000, recoverable by defendants from plaintiff.
For all of the foregoing reasons, it is, therefore ordered, adjudged and decreed that plaintiffs application for summary judgment and appointment of a referee is denied; and it is further ordered, adjudged and decreed that plaintiff, its successors, assigns and others are forever barred, foreclosed and prohibited from demanding, collecting or attempting to collect, directly or indirectly, any and all of the sums in this proceeding delineated as interest, default interest, attorney’s fees, legal fees, costs, disbursements, advances or any sums other than the principal balance, that may have accrued from May 1, 2008 up to the date of this order; and it is further ordered, adjudged and decreed that defendants Anthony J. Corcione and Jane Corcione residing at 66 Circle Drive, East Northport, New York 11731 recover judgment against plaintiff Emigrant Mortgage Co. Inc., with an office located at 5 East 42nd Street, New York, New York 10017, in the principal sum of $100,000 representing exemplary damages, and that defendants have execution therefor.