OPINION OF THE COURT
Dickerson, J.
*11 Introduction
The much-publicized subprime mortgage crisis, the impact of which would be difficult to exaggerate, devastated the financial markets, domestically and globally (see Jenny Anderson & Heather Timmons, Why a U.S. Subprime Mortgage Crisis Is Felt Around the World, NY Times, Aug. 31, 2007). A primary component of this phenomenon was an explosion in mortgage foreclosures in this country, beginning in 2007 (see Hon. Mark C. Dillon, The Newly-Enacted CPLR 3408 for Easing the Mortgage Foreclosure Crisis: Very Good Steps, but not Legislatively Perfect, 30 Pace L Rev 855, 855-856 [2010]; Nelson D. Schwartz, Can the Mortgage Crisis Swallow a Town?, NY Times, Sept. 2, 2007). In an effort to address the mortgage foreclosure crisis in New York, the legislature passed the Subprime Residential Loan and Foreclosure Law (see L 2008, ch 472; see also Hon. Mark C. Dillon, 30 Pace L Rev at 856). This law enacted, among other statutes, CPLR 3408, effective on August 5, 2008 (see L 2008, ch 472, § 3).
CPLR 3408 provides for mandatory settlement conferences in certain residential foreclosure actions (see former CPLR 3408). In 2009, shortly after the passage of the Subprime Residential Loan and Foreclosure Law, the legislature amended a number of the recently enacted statutes, including CPLR 3408 (see L 2009, ch 507). The purposes of the amendments were to allow more homeowners at risk of foreclosure to benefit from consumer protection laws and opportunities to prevent foreclosure; to establish certain requirements for plaintiffs in foreclosure actions obligating them to maintain the subject properties; to establish protections for tenants living in foreclosed properties; and to strengthen consumer protections aimed at defeating “rescue scams” (Governor’s Approval Mem, Bill Jacket, L 2009, ch 507 at 5). The 2009 amendments include a provision requiring that “[b]oth the plaintiff and defendant shall negotiate in good faith to reach a mutually agreeable resolution, including a loan modification, if possible” (CPLR 3408 [f]).
While CPLR 3408 (f) requires the parties at a settlement conference to negotiate in good faith, that section “does not set forth any specific remedy for a party’s failure” to do so (Hon. Mark C. Dillon, 30 Pace L Rev at 875). In the absence of specific statutes and rules to establish the consequences for a party’s failure to comply with the good-faith obligation imposed by CPLR 3408 (f), the Supreme Court here fashioned its own remedy. While we agree with the Supreme Court’s finding that the *12 plaintiff lender failed to negotiate in good faith, for the reasons which follow, we conclude that the remedy employed by the court, which compels the plaintiff to modify its loan agreement, cannot stand.
Factual and Procedural Background
On September 2, 2009, the plaintiff Wells Fargo Bank, N.A., as successor to Wells Fargo Home Mortgage, Inc. (hereinafter Wells Fargo), commenced this action in the Supreme Court, Suffolk County, to foreclose on three consolidated mortgages. The mortgaged premises were located in Deer Park. The defendant Paul Meyers (hereinafter Paul) allegedly executed the underlying note, and Paul and the defendant Michela Meyers (hereinafter Michela) (hereinafter together the defendants) were the mortgagors.
In its complaint, Wells Fargo alleged that the defendants defaulted on the consolidated mortgages by failing to make the monthly payment due on February 1, 2009, and that Wells Fargo elected to call due the entire amount secured by the consolidated mortgages, in the principal sum of $310,467.70, plus interest at a rate of 5.75% accruing from January 1, 2009. Wells Fargo also alleged that it was the holder of the note and mortgage being foreclosed. However, Wells Fargo subsequently indicated that the Federal Home Loan Mortgage Corporation, commonly known as Freddie Mac, was actually the owner of the note and mortgage, and Wells Fargo was the servicer.
According to the defendants, when they refinanced their loan in 2004, their initial monthly payments were approximately $2,200. By December 2008, the payments had increased to $2,785.64. At some point, Paul, a New York City Police Officer, had his overtime hours decreased, and he also lost his second job. In or about November 2008, Michela contacted Wells Fargo about a loan modification. The defendants did not receive a response from Wells Fargo until January 2009. Michela was informed that the defendants would be required to default on the mortgage for a period of three months in order to qualify for a modification.
Although they had never previously defaulted on their monthly mortgage payments, based on the instructions of Wells Fargo representatives, the defendants stopped tendering their monthly mortgage payments. During the following three months, Michela called Wells Fargo “every couple of weeks” for assistance. According to Michela, in April 2009, a Wells Fargo *13 representative informed her that the defendants had been accepted into a loan modification program. To initiate the program, the defendants were required to make a down payment in the sum of $2,826.50. According to Michela, she had already submitted the down payment, along with a hardship letter and the financial documentation requested by Wells Fargo. However, Michela claimed that the Wells Fargo representatives repeatedly told her that Wells Fargo had misplaced the documents, and that they required updated documents.
In August 2009, the defendants received a trial modification offer from Wells Fargo under the Federal Home Affordable Modification Program (also referred to as the Home Affordable Mortgage Program [hereinafter HAMP]). This initial modification offer required the defendants to make three trial payments in the amount of $1,955.49. The defendants signed the forms to accept the trial modification offer on September 1, 2009. The defendants made the trial payments. Michela contacted Wells Fargo to inquire about final modification status, and she was informed that the matter remained under review.
The initial modification offer indicated, among other things, that, so long as the defendants complied with the terms of the offer, Wells Fargo would not foreclose on the mortgage during the trial period. Nonetheless, Wells Fargo commenced this foreclosure action on September 2, 2009. Wells Fargo representatives would later state that they “had no idea” why the defendants had been served with a summons and complaint.
Thereafter, Wells Fargo informed the defendants that, due to a miscalculation, a second three-month trial period was required with slightly lower monthly payments. The defendants accepted the second HAMP trial modification offer and made the trial payments of approximately $1,898 per month. However, on April 28, 2010, Wells Fargo sent the defendants a letter denying their request for modification. The letter indicated that the defendants did not qualify for a HAMP modification since their monthly housing expense was less than 31% of their gross monthly income.
According to Michela, when the parties appeared for a conference before a referee, Wells Fargo indicated that it would send the defendants another modification offer within five to seven days. However, on May 20, 2010, the defendants received another letter indicating that Wells Fargo could not modify the terms of the mortgage. This letter stated that the defendants’ application was denied because the “investor” on the mortgage, *14 Freddie Mac, declined the requested modification. Nonetheless, one week later, Wells Fargo sent the defendants another letter directing them to apply for HAMP modification. Michela claimed that she was informed that Wells Fargo was reopening the defendants’ file.
Wells Fargo offered the defendants yet another modification, which required monthly payments of $2,554, would extend the term of the mortgage an additional 15 years, and would result in the defendants paying substantially more money in interest over the term of the loan. The defendants could not afford these payments and rejected the offer. Wells Fargo did not extend any additional offers to the defendants.
After the parties could not reach a settlement, the Supreme Court, without objection, set the matter down for a hearing to determine whether Wells Fargo fulfilled its obligation, imposed pursuant to CPLR 3408 (f), to “negotiate in good faith to reach a mutually agreeable resolution.”
The Supreme Court conducted the hearing over a period of three days, on September 22, 23, and 27, 2010. The foregoing history of the parties’ negotiating efforts was described through testimony at the hearing, and is undisputed. In addition, Tarlisha Nelson, a loss mitigation manager for Wells Fargo, testified at the hearing that Freddie Mac was the owner of the note and mortgage, and that there was no latitude to modify or restructure the loan without Freddie Mac’s approval. According to Nelson, the final offer extended to the defendants had been approved by Freddie Mac. In fact, at the hearing, Nelson testified that this loan modification was still available to the defendants. Nelson stated that Wells Fargo had been willing to work with the defendants to restructure their loan. Nelson testified that Wells Fargo offered the defendants several “moratoriums.”
The Order Appealed From
Following the hearing, in the order appealed from, dated November 10, 2010, the Supreme Court found that Wells Fargo failed to negotiate with the defendants in good faith, as required under CPLR 3408 (see Wells Fargo Bank, N.A. v Meyers, 30 Misc 3d 697, 701 [2010]). Upon that finding, the Supreme Court directed Wells Fargo to execute a final loan modification based on the terms of the original modification proposal, and directed the dismissal of the complaint (see id.). The court set forth its reasoning as follows:
*15 “A foreclosure action is equitable in nature and triggers the equitable powers of the court (see Notey v Darien Constr. Corp., 41 NY2d 1055 [1977]; Jamaica Sav. Bank v M. S. Inv. Co., 274 NY 215 [1937]; Mortgage Elec. Registration Sys., Inc. v Horkan, 68 AD3d 948 [2d Dept 2009]). ‘Once equity is invoked, the court’s power is as broad as equity and justice require’ (Mortgage Elec. Registration Sys., Inc. v Horkan at 948, quoting Norstar Bank v Morabito, 201 AD2d 545 [2d Dept 1994]). . . .
“Here, the record demonstrates that [Wells Fargo] commenced this foreclosure action on September 2, 2009, just one day after the defendants accepted the proposed trial modification. The packet sent to the defendants advised them that a foreclosure action would not be commenced if the defendants complied with the terms of the trial period. Even if [Wells Fargo] did not receive the defendants’ acceptance on September 1, the modification packet provided that the defendants had until September 9, 2009 to accept the offer. [Wells Fargo] has offered no explanation for commencing this action while the modification proposal was still pending. Therefore, this conduct alone demonstrates bad faith on the part of [Wells Fargo] which would invoke the equitable powers of the court.
“The record also demonstrates that the defendants accepted the trial modification and made all the required monthly payments. [Wells Fargo] then modified the payments and required a new trial period. It is undisputed that the defendants again made all the monthly payments. Nevertheless, [Wells Fargo] denied the defendants’ request for a permanent modification based on their debt to income ratio. However, the record contains no evidence to support this determination. The letter sent to the defendants is conclusory and does not establish how [Wells Fargo] made this determination. [Nelson] had no personal knowledge of the decision and merely recited the figure in [Wells Fargo’s] files. No evidence was submitted to demonstrate the actual calculation made by [Wells Fargo] and whether the information used was correct.
“In addition, [Wells Fargo] has provided conflicting *16 information regarding its denial of the modification. Less than one month after the initial denial, the defendants received another letter indicating that [Wells Fargo] could not adjust the terms of the mortgage because the investor on the mortgage declined the requested modification. Within a week, the defendants were sent additional letters advising them of mortgage options and again directing them to apply to [HAMP]. This is inconsistent as [Wells Fargo] takes the position that it cannot modify the loan without the approval of Freddie Mac but offered no evidence as to whether the initial modification was approved by Freddie Mac before it was sent to the defendants. Freddie Mac is not a party to this action and is not the party seeking to foreclose the mortgage. [Wells Fargo] has failed to demonstrate any good faith basis for refusing to honor the terms of the trial modification or offering another similar proposal. The defendants complied with all the requirements of the trial modification and have appeared at all the conferences in this action. The defendant Paul Meyers is gainfully employed and the defendants are trying to avoid losing their home. Under these circumstances, the court finds that [Wells Fargo] has acted in bad faith. In view of the court’s broad equitable powers, the court finds that the appropriate remedy is to compel specific performance of the original modification agreement proposed by the plaintiff and accepted by the defendants (see e.g. EMC Mtge. Corp. v Gross, 289 AD2d 438 [2d Dept 2001])” (Wells Fargo Bank, N.A. v Meyers, 30 Misc 3d at 700-701).
Analysis
Appealability
As a preliminary matter, the order appealed from here did not decide a motion made on notice. As such, this order is not appealable as of right, as no appeal lies as of right in an action, originating in the Supreme Court, from an order which does not determine a motion made on notice (see CPLR 5701 [a] [2]). Nonetheless, since this case presents a very important issue, we deem Wells Fargo’s notice of appeal to be an application for leave to appeal, and grant Wells Fargo leave to appeal (see CPLR 5701 [c]).
*17 Finding of Failure to Negotiate in Good Faith As the Supreme Court observed, Wells Fargo offered no explanation for commencing this action despite its representation that it would not initiate any foreclosure action during the HAMP trial period. Additionally, Wells Fargo does not deny that its own representatives advised the defendants to default on their mortgage in order to qualify for a loan modification program. Wells Fargo maintains that this conduct should not be taken into consideration in determining whether it satisfied its obligation pursuant to CPLR 3408 (f) to “negotiate in good faith to reach a mutually agreeable resolution” at the mandatory settlement conference because they occurred prior thereto. However, this conduct is relevant in the overall context of the parties’ relationship and the negotiations between them.
Furthermore, it is undisputed that, during a settlement conference in May 2010, Wells Fargo informed the defendants that they could expect to receive a final modification within one week. Instead, the defendants received another denial letter, and an invitation to begin yet another HAMP trial period.
Moreover, Wells Fargo’s final offer to the defendants would have extended the defendants’ mortgage term by 15 years, would have required the defendants to pay hundreds of thousands of dollars more in interest, and would have only offered them relief in the form of monthly payments amounting to $271.93 less than their monthly payments before they sought modification.
Granting deference to the Supreme Court, which presided over this case, including the settlement conferences and the “good faith hearing” (see Decker v Decker, 91 AD3d 1291, 1292 [2012]), we see no reason to disturb that court’s finding that Wells Fargo failed to satisfy its obligation pursuant to CPLR 3408 (f) to “negotiate in good faith to reach a mutually agreeable resolution.”
Statutory Framework and Application The original version of CPLR 3408 applied only to those foreclosure actions involving high cost home loans or subprime or nontraditional home loans (see former CPLR 3408 [a]). CPLR 3408 (a) imposed the requirement that, in residential foreclosure actions involving the type of loans within the ambit of that section, in which the defendant was a resident of the subject property, the court would hold a mandatory conference for settlement discussions,
*18 “including, but not limited to determining whether the parties can reach a mutually agreeable resolution to help the defendant avoid losing his or her home, and evaluating the potential for a resolution in which payment schedules or amounts may be modified or other workout options may be agreed to, and for whatever other purposes the court deems appropriate” (former CPLR 3408 [a]).
In November 2009, the legislature amended the statute to broaden its applicability (see L 2009, ch 507, § 9). As amended, the statute now applies to “any residential foreclosure action involving a home loan as such term is defined in section thirteen hundred four of the real property actions and proceedings law, in which the defendant is a resident of the property subject to foreclosure” (CPLR 3408 [a]). As amended, CPLR 3408 (a) provides,
“In any residential foreclosure action involving a home loan as such term is defined in section thirteen hundred four of the real property actions and proceedings law, in which the defendant is a resident of the property subject to foreclosure, the court shall hold a mandatory conference within sixty days after the date when proof of service is filed with the county clerk, or on such adjourned date as has been agreed to by the parties, for the purpose of holding settlement discussions pertaining to the relative rights and obligations of the parties under the mortgage loan documents, including, but not limited to determining whether the parties can reach a mutually agreeable resolution to help the defendant avoid losing his or her home, and evaluating the potential for a resolution in which payment schedules or amounts may be modified or other workout options may be agreed to, and for whatever other purposes the court deems appropriate.”
The 2009 amendments to CPLR 3408 also added subdivision (f), which provides, “Both the plaintiff and defendant shall negotiate in good faith to reach a mutually agreeable resolution, including a loan modification, if possible.” This is the section at issue on this appeal.
Section 10-a (1) of chapter 507 of the Laws of 2009 provided,
“The chief administrator of the courts shall, within 90 days of the enactment of this chapter, promulgate *19 such additional rules as may be necessary to ensure the just and expeditious processing of all settlement conferences authorized hereunder. Such court rules shall ensure, among other things, that each judge, judicial hearing officer or referee who is overseeing a settlement conference as authorized herein, shall have the necessary authority and power to fulfill the mandates of this act. This shall include, but not be limited to, ensuring that each party fulfills its legal obligation to negotiate in good faith and seeing that conferences not be unduly delayed or subject to willful dilatory tactics so that the rights of both parties may be adjudicated in a timely manner. Such rules may include granting additional authority to sanction the egregious behavior of a counsel or party.”
The procedures and rules for CPLR 3408 settlement conferences promulgated by the Chief Administrator of the Courts are set forth in 22 NYCRR 202.12-a. With regard to the obligation of the parties to negotiate in good faith imposed by CPLR 3408 (f), these rules provide,
“The parties shall engage in settlement discussions in good faith to reach a mutually agreeable resolution, including a loan modification if possible. The court shall ensure that each party fulfills its obligation to negotiate in good faith and shall see that conferences not be unduly delayed or subject to willful dilatory tactics so that the rights of both parties may be adjudicated in a timely manner” (22 NYCRR 202.12-a [c] [4]).
Notwithstanding the obvious intent of the foregoing statutes and rules, again, “CPLR 3408(f) does not set forth any specific remedy for a party’s failure to negotiate in good faith” (Hon. Mark C. Dillon, 30 Pace L Rev at 875). While section 10-a (1) of chapter 507 of the Laws of 2009 expressly provided that the rules to be promulgated by the Chief Administrator of the Courts to govern CPLR 3408 (f) settlement conferences “may include granting additional authority to sanction the egregious behavior of a counsel or party,” no specific sanction or remedy was set forth in these rules.
It would certainly seem that CPLR 3408 (f) and 22 NYCRR 202.12-a (c) (4) both provide the courts with the authority to take some action where a party fails to satisfy its obligation to *20 negotiate in good faith. Again, CPLR 3408 (f) mandates that the parties “shall negotiate in good faith to reach a mutually agreeable resolution, including a loan modification, if possible.” The provisions of 22 NYCRR 202.12-a echo the requirement of CPLR 3408 (f), and further state that “[t]he court shall ensure that each party fulfills its obligation to negotiate in good faith” (22 NYCRR 202.12-a [c] [4]).
It is vital to remain mindful of the entirely appropriate limitations of CPLR 3408. The section requires settlement conferences in foreclosure actions to explore the issue, among others, of “whether the parties can reach a mutually agreeable resolution to help the defendant avoid losing his or her home, and evaluating the potential for a resolution in which payment schedules or amounts may be modified or other workout options may be agreed to” (CPLR 3408 [a]). Moreover, the parties are required to negotiate in good faith (see CPLR 3408 [f]). However, it is obvious that the parties cannot be forced to reach an agreement, CPLR 3408 does not purport to require them to, and the courts may not endeavor to force an agreement upon the parties.
In the absence of specific guidance from the legislature or the Chief Administrator of the Courts as to the appropriate sanctions or remedies to be employed where a party is found to have violated its obligation to negotiate in good faith pursuant to CPLR 3408 (f), the courts have resorted to a variety of alternatives in an effort to enforce the statutory mandate to negotiate in good faith. For example, upon finding that foreclosing plaintiffs have failed to negotiate in good faith, courts have barred them from collecting interest, legal fees, and expenses (see Bank of Am. N.A. v Lucido, 35 Misc 3d 1211[A], 2012 NY Slip Op 50655[U] [Sup Ct, Suffolk County 2012]; BAC Home Loans Servicing v Westervelt, 29 Misc 3d 1224[A], 2010 NY Slip Op 51992[U] [Sup Ct, Dutchess County 2010]; Emigrant Mtge. Co. Inc. v Corcione, 28 Misc 3d 161 [Sup Ct, Suffolk County 2010], vacated on rearg 2010 WL 7014850 [Sup Ct, Suffolk County, Oct. 14, 2010, No. 2009-28917]; Wells Fargo Bank, N.A. v Hughes, 27 Misc 3d 628 [Sup Ct, Erie County 2010]), imposed exemplary damages against them (see Bank of Am. N.A. v Lucido, 35 Misc 3d 1211[A], 2012 NY Slip Op 50655[U] [2012]; Emigrant Mtge. Co. Inc. v Corcione, 28 Misc 3d 161 [2010], vacated on rearg 2010 WL 7014850 [2010]), stayed the foreclosure proceedings (see Deutsche Bank Trust Co. of Am. v Davis, 32 Misc 3d 1210[A], 2011 NY Slip Op 51238[U] [Sup Ct, Kings *21 County 2011]), imposed a monetary sanction pursuant to 22 NYCRR part 130 (see Deutsche Bank Trust Co. of Am. v Davis, 32 Misc 3d 1210[A], 2011 NY Slip Op 51238[U] [2011]; cf. BAC Home Loans Servicing v Westervelt, 29 Misc 3d 1224[A], 2010 NY Slip Op 51992[U] [2010]), dismissed the action (Wells Fargo Bank, N.A. v Hughes, 27 Misc 3d 628 [2010]), and vacated the judgment of foreclosure and sale and cancelled the note and mortgage (IndyMac Bank F.S.B. v Yano-Horoski, 26 Misc 3d 717, 718 [Sup Ct, Suffolk County 2009], revd 78 AD3d 895 [2010]).
In IndyMac, we determined that the “severe sanction imposed by the Supreme Court of cancelling the mortgage and note was not authorized by any statute or rule” (IndyMac Bank F.S.B. v Yano-Horoski, 78 AD3d at 896). However, with the exception of IndyMac, we have not had occasion to review the propriety of other means of enforcing the statutory mandate of CPLR, 3408 (f).
The Remedy Employed Here
While we do not rule out the possibility of other permissible remedies, we conclude that the one employed here — the imposition of the terms of the so-called “original modification agreement proposed by the plaintiff and accepted by the defendants” (Wells Fargo Bank, N.A. v Meyers, 30 Misc 3d at 701), as the new, binding terms of the agreement between the defendants and Freddie Mac — was unauthorized and inappropriate.
The “original modification agreement” was merely a trial arrangement, not an agreement for the binding obligations of the parties going forward. Moreover, in light of Wells Fargo’s representation that Freddie Mac did not approve of the earlier trial modification terms,
“[e]ven if the HAMP trial period was an agreement, it is not subscribed by the party against which it is intended to be enforced. Therefore, the HAMP trial period is not a proper agreement regarding real property and cannot be enforced by [the defendants] as an agreement. Consequently, the HAMP trial period is not an agreement that may be extended” (HSBC Mtge. Corp. [USA] v Gigante, 2011 NY Slip Op 33327[U], *9 [Sup Ct, Richmond County 2011] [footnote omitted]).
Moreover, as the Court of Appeals stated, and as we have observed in, among other things, the context of foreclosure ac *22 tions, “ ‘stability of contract obligations must not be undermined by judicial sympathy’ ” (Emigrant Mtge. Co., Inc. v Fisher, 90 AD3d 823, 824 [2011] [internal quotation marks omitted], quoting First Natl. Stores v Yellowstone Shopping Ctr., 21 NY2d 630, 638 [1968], and Graf v Hope Bldg. Corp., 254 NY 1, 4-5 [1930]). The courts may not rewrite the contract that the parties freely entered into — the loan and mortgage agreements — upon a finding that one of those parties failed to satisfy its obligation to negotiate in good faith pursuant to CPLR 3408; “ ‘[t]he court’s role is limited to interpretation and enforcement of the terms agreed to by the parties, and the court may not rewrite the contract or impose additional terms which the parties failed to insert’ ” (Maser Consulting, P.A. v Viola Park Realty, LLC, 91 AD3d 836, 837 [2012], quoting 131 Heartland Blvd. Corp. v C.J. Jon Corp., 82 AD3d 1188, 1189 [2011]).
Indeed, the Supreme Court’s interpretation of CPLR 3408 (f) as authorizing it to, in effect, rewrite the mortgage and loan agreement would violate the Contract Clause of the United States Constitution (see US Const, art I, § 10 [1] [hereinafter the Contract Clause]). The potential impairment to contracting parties under such an interpretation would be substantial, and, notwithstanding the laudable purpose of the legislation, such an interpretation would be neither reasonable nor necessary to accomplish the legitimate public purpose at issue (see generally Association of Surrogates & Supreme Ct. Reporters Within City of N.Y. v State of New York, 79 NY2d 39, 46 [1992]). The Contract Clause “is not an absolute and utterly unqualified restriction of the State’s protective power” (Home Building & Loan Assn. v Blaisdell, 290 US 398, 447 [1934]). Thus, in theory, a remedy could be fashioned to address a violation of CPLR 3408 (f). However, the remedy employed by the Supreme Court here, in binding the parties to terms never agreed upon by either side, is without any source for its authority, and goes well beyond what would be justified by the State “to safeguard the vital interests of its people” (Exxon Corp. v Eagerton, 462 US 176, 190 [1983] [internal quotation marks omitted]).
In addition, the Supreme Court’s determination violated Wells Fargo’s due process rights. Wells Fargo was not on notice that the Supreme Court was considering a remedy such as the imposition of the terms of the modification proposal on a permanent basis (see IndyMac Bank F.S.B. v Yano-Horoski, 78 AD3d at 896), and due process requires that a party receive notice that the court would entertain such a remedy (cf. Novick v Novick, 251 AD2d 385, 386 [1998]).
*23 Finally, the remedy employed by the Supreme Court is, in fact, at odds with the very statute at issue. CPLR 3408 (a) requires the parties to participate in the settlement conference in order to, inter alia, “determin[e] whether the parties can reach a mutually agreeable resolution to help the defendant avoid losing his or her home.” CPLR 3408 (f) requires the parties to proceed in good faith in endeavoring “to reach a mutually agreeable resolution, including a loan modification, if possible.” Rewriting the parties’ agreement based on the terms of the first trial modification, against Wells Fargo’s will, upon a finding that Wells Fargo demonstrated bad faith, cannot be deemed a “mutually agreeable resolution” to the matter.
Conclusion
In sum, it is beyond dispute that CPLR 3408 is silent as to sanctions or the remedy to be employed where a party violates its obligation to negotiate in good faith. In amending CPLR 3408 to add subdivision (f), the legislature declined to authorize or set forth any particular sanction or penalty to impose upon a party found to have failed to satisfy its obligation under CPLR 3408 (f) to negotiate in good faith. Unless the legislature chooses to specify appropriate sanctions or remedies to be employed in such circumstances, the courts will continue to endeavor to enforce the mandate of CPLR 3408 (f) as best they can in the absence of a sanctioning provision.
The remedy employed by the Supreme Court here was unauthorized and violated the Contract Clause and Wells Fargo’s due process rights. Thus, the order directing Wells Fargo to execute a final modification patterned after the terms of the trial loan modification proposal and directing dismissal of the complaint cannot stand.
In the absence of a specifically authorized sanction or remedy in the statutory scheme, the courts must employ appropriate, permissible, and authorized remedies, tailored to the circumstances of each given case. What may prove appropriate recourse in one case may be inappropriate or unauthorized under the circumstances presented in another. Accordingly, in the absence of further guidance from the legislature or the Chief Administrator of the Courts, the courts must prudently and carefully select among available and authorized remedies, tailoring their application to the circumstances of the case.
In light of our determination, we need not reach Wells Fargo’s remaining contention.
*24 Accordingly, on the Court’s own motion, Wells Fargo’s notice of appeal from the order is treated as an application for leave to appeal, and leave to appeal is granted (see CPLR 5701 [c]), the order is reversed, on the law, and the matter is remitted to the Supreme Court, Suffolk County, for further proceedings consistent herewith.
Angiolillo, J.P., Austin and Cohen, JJ., concur.
Ordered that on the Court’s own motion, the plaintiffs notice of appeal from the order is treated as an application for leave to appeal, and leave to appeal is granted (see CPLR 5701 [c]); and it is further,
Ordered that the order is reversed, on the law, without costs or disbursements, and the matter is remitted to the Supreme Court, Suffolk County, for further proceedings consistent herewith.