OPINION OF THE COURT
Jack M. Battaglia, J.
This action was commenced on March 11, 2009 to foreclose a mortgage on property located at 448 Decatur Street, Brooklyn. The subject mortgage, dated March 27, 2007, was given to “MORTGAGEIT” as lender to secure payment of an adjustable rate note with the same date in the principal amount of $624,000, which note was also given to “MORTGAGEIT” as lender. The borrower designated in the note and mortgage is defendant John T. McKenna, Jr. The note shows an undated indorsement on behalf of “Mortgagelt, Inc.” to the order of plaintiff, and an assignment of mortgage dated March 2, 2009 purports to assign the subject mortgage from Mortgage Electronic Registration Systems, Inc., designated in the mortgage as “a nominee for Lender” and so-called “mortgagee of record,” to plaintiff.
This mortgage foreclosure action was referred to the Mandatory Foreclosure Conference Part, where it was first calendared for May 21, 2009. On May 25, 2011, after 18 further scheduled appearances, the action was referred to this court.
A conference was held on June 27, 2011, at which time Special Referee Deborah L. Goldstein advised the court that she was requesting a finding by the court that plaintiff had not complied with its obligations under CPLR 3408, and, upon such finding, imposing a suitable penalty. A schedule was agreed upon for Special Referee Goldstein to prepare a written report and recommendations, which she did with a report and recommendation *888 dated July 8, 2011, and for plaintiff and defendant mortgagor John McKenna, Jr. to comment, which they each did.
CPLR 3408 requires a mandatory settlement conference in every “residential foreclosure action” involving a home loan as defined in RPAPL 1304 “in which the defendant is a resident of the property subject to foreclosure.” (See CPLR 3408 [a].) The statute further provides, “Both the plaintiff and defendant shall negotiate in good faith to reach a mutually agreeable resolution, including a loan modification, if possible.” (CPLR 3408 [f].)
The report and recommendation of Special Referee Goldstein seeks the imposition of a penalty on plaintiff for failing to negotiate in good faith as required by CPLR 3408 (f). Although Special Referee Goldstein also refers to part 130 of the Rules of the Chief Administrator of the Courts (see 22 NYCRR 130-1.1 et seq.) and Judiciary Law §§ 753 and 754, the essential thrust of the report to this court is the contention that plaintiff acted in bad faith in refusing to agree to a “short sale” of the mortgaged property as proposed by defendant McKenna.
Plaintiff raised a threshold question, however, as to whether defendant McKenna is or has ever been “a resident of the property subject to foreclosure” (see CPLR 3408 [a]), so as to trigger plaintiffs obligation to negotiate with him “in good faith to reach a mutually agreeable resolution” (see CPLR 3408 [f]). Plaintiff submitted copies of documents dated subsequent to the commencement of this action that show defendant McKenna’s address to be different from the property subject to foreclosure, and the report and recommendation notes that, at least at one point, “the premises were vacant because it required repairs.” Since the July 2011 report and recommendation does not state that the Special Referee had made any finding as to Mr. McKenna’s residency at the mortgaged property, with a decision and order dated October 3, 2011, the court referred the matter back to Referee Goldstein with a direction that she
“supplement her Report and Recommendation with a statement as to her finding that defendant Mc-Kenna was a resident of the mortgaged property when the action was commenced and through the settlement conference process; or, if she has not made such finding, she shall direct and schedule such proceedings, including such further appearances and submissions as she might deem appropriate, so that she might make a determination on the issue of residency.”
*889 A determination as to whether the mortgagor would be deemed “a resident of the property subject to foreclose” for purposes of CPLR 3408 (a) is crucial, however, to whether there is an obligation under CPLR 3408 (f) to negotiate “in good faith to reach a mutually agreeable resolution.” No such obligation is imposed by uniform court rules or the local rule, assuming that it could be. The July 2011 report and recommendation cites to no other source of an express “good faith” obligation that would apply to conferences that are not mandated by CPLR 3408 (a).
After additional conferences with the parties and further submissions by them, Special Referee Goldstein issued a supplemental report and recommendation dated July 13, 2012, in which she concluded that the “good faith” obligation imposed by CPLR 3408 (f) should apply here. Her reasons for so concluding were summarized as follows:

“I. Defendant Submitted Evidence Proving That He Resided At The Brooklyn Premises At The Time of Commencement and During CPLR 3408 Conferencing

“Defendant submitted uncontroverted testimonial and documentary evidence proving that he resided at the Premises from January 2009 through December 2010, the two-year period during which he and his wife were separated. Based on the evidence, this Referee has determined that Defendant resided at the Premises at the time of commencement in March 2009 and throughout the majority of CPLR 3408 conferencing. Plaintiff failed to satisfy its burden of disproving Defendant’s residence at the Premises.

“II. Plaintiff Failed To Submit An Affidavit of Exemption From CPLR 3408 With An Affidavit Of Investigation In Compliance With Kings County Local Rules, Part F (7)

“While Defendant submitted affidavit testimony regarding his residence at the Brooklyn Premises from January 2009 through December 2010, Plaintiff failed to submit an affidavit for an exemption from CPLR 3408 and an affidavit of investigation regarding Defendant’s residency, as explicitly required under the Kings County Local Rules, Part F(7).

“III. Plaintiff Is Judicially Estopped From Challenging Application of CPLR 3408

*890 “Plaintiff is judicially estopped from challenging application of the good faith requirement of CPLR 3408 (f). The doctrine of ‘judicial estoppel’ or ‘estoppel against inconsistent positions’ may be invoked to prevent a party from ‘inequitably adopting a position directly contrary to or inconsistent with an earlier assumed position in the same proceeding’ Maas v. Cornell Univ., 253 AD2d 1, 5, affd. 94 NY2d 87.”
Nature and Scope of CPLR 3408 Reference
The court is unaware of any court rule or judicial decision that specifically addresses whether referral for determination for purposes of CPLR 3408 should be considered made pursuant to the “hear and determine” provisions of CPLR 4301 et seq. or pursuant to the “hear and report” provisions of the statute and the Uniform Civil Rules for the Supreme Court and the County Court (22 NYCRR) § 202.44. The specific uniform rules for mandatory settlement proceedings do not address referrals. (See Uniform Civ Rules for Sup Ct & County Ct [22 NYCRR] § 202.12-a.)
An order of reference to hear and determine dated June 1, 2011 of Honorable Sylvia O. Hinds-Radix, Administrative Judge for Civil Matters, Second Judicial District, provides in part:
“ORDERED that foreclosure actions assigned to the Residential Foreclosure Conference Part shall be presided over by Court Attorney Referees Paul Nuccio, Deborah Goldstein, Dale Berson, Noreen SotoFier, and Jeffrey Amster, sitting separately on dates and times to be designated by the court, to hear and determine whether a mutually agreeable resolution to the foreclosure proceeding pending before them can be reached at the mandatory conference stage; and it is further
“ORDERED that Referees Nuccio, Goldstein, Berson, Soto-Fier, and Amster may conference, negotiate, settle, adjourn, and make procedural determinations regarding the qualifications of cases pending before them in the Residential Foreclosure Conference Part, as defined by the laws of New York State, and in conjunction with all applicable federal legislation and/or programs; and it is further
“ORDERED that Referees Nuccio, Goldstein, Berson, Soto-Fier, and Amster may so-order stipula *891 tions with the consent of both parties to a pending action; . . .
In addition to specific authority to appoint a referee to act in particular contexts, such as to supervise disclosure (see CPLR 3104) and to transfer an interest in real property (see RPAPL 1611), courts are authorized to “appoint a referee to determine an issue, perform an act, or inquire and report in any case where this power was heretofore exercised and as may be hereafter authorized by law” (see CPLR 4001). Whether the appointed referee is to determine an issue or to inquire and report is directed by the order of reference (see CPLR 4311), but is not solely within the court’s discretion. Rather, a reference to determine may only be made in certain cases (see CPLR 4317), as may a reference to report (see CPLR 4212), and the referee’s respective powers thereupon are defined by statute (see CPLR 4301 [referee to determine], 4201 [referee to report]).
The hallmark of the reference to determine is the consent of the parties. (See CPLR 4317 [a].) A reference to determine may be made without the consent of the parties only “where the trial will require the examination of a long account, including actions to foreclose mechanic’s liens; or to determine an issue of damages separately triable and not requiring a trial by jury; or where otherwise authorized by law.” (See CPLR 4317 [b].) A reference to report may be made “upon a showing of some exceptional condition requiring it or in matters of account.” (See CPLR 4212.)
Here, as noted above, the June 1, 2011 order of the Administrative Judge is designated an order of reference to hear and determine, and, as will appear again, the decretal paragraphs reflect that. The order cites as authority CPLR 4301 (Powers of referee to determine), CPLR 4311 (Order of reference), and CPLR 4312 (Number of referees; qualifications), but does not cite either of the statutory provisions that address the circumstances in which a reference to report (see CPLR 4212) or a reference to determine (see CPLR 4317) may be made.
Specifically, the referees assigned to the Residential Foreclosure Conference Part may “hear and determine whether a mutually agreeable resolution to the foreclosure proceeding pending before them can be reached at the mandatory conference stage”; “may conference, negotiate, settle, adjourn, and make procedural determinations regarding the qualifications of cases pending before them in the Residential Foreclosure Conference Part, as defined by the laws of New York State”; *892 and “may so-order stipulations with the consent of both parties.”
Similar issues arise with respect to a referee’s report and recommendations at the conclusion of settlement conference proceedings that do not result in a “mutually agreeable resolution,” including any determination as to whether either of the parties failed to negotiate in good faith. The June 1, 2011 order of reference to hear and determine provides in part:
“ORDERED that upon the conclusion of a mandatory settlement conference, the presiding referee shall issue a Residential Foreclosure Conference Order, in the form annexed, to be filed with the County Clerk in and for the County of Kings, memorializing the results of the conference and setting forth those further proceedings that shall occur in the pending foreclosure action.”
The annexed form includes direction to a judge for determination of any question as to the good faith participation of any party in settlement conference proceedings.
The June 1, 2011 order of reference to hear and determine does not expressly include the authority to hear and determine any question as to the applicability of the duty of good faith imposed by CPLR 3408 (f) in settlement conference proceedings mandated by CPLR 3408 (a), nor does the order expressly include the authority to hear and determine any question as to whether a party discharged its duty to negotiate in good faith. The court will assume that a reference for such purposes would not be appropriate under CPLR 4317 (b). (See Schanback v Schanback, 130 AD2d 332, 337-344 [2d Dept 1987]; see also Matter of Marett v Pegalis & Wachsman, 176 AD2d 321, 322 [2d Dept 1991]; but see Tri-State Sol-Aire Corp. v United States Fid. & Guar. Co., 161 AD2d 757 [2d Dept 1990]; City of Poughkeepsie v Poughkeepsie Associated Fire Dept., 125 AD2d 522, 523 [2d Dept 1986].)
“[T]he scope of a referee’s duties are defined by the order of reference” (First Data Merchant Servs. Corp. v One Solution Corp., 14 AD3d 534, 535 [2d Dept 2005]; see also Hovhannessian v Yetemian, 75 AD3d 623, 623-624 [2d Dept 2010]), and “[a] referee has no power beyond that limited in the order of reference” (L. H. Feder Corp. v Bozkurtian, 48 AD2d 701, 701 [2d Dept 1975]; see also Fernald v Vinci, 302 AD2d 354, 355 [2d Dept 2003]). Although statute and case law address the functions and authority of referees at various stages of a mortgage *893 foreclosure action (see RPAPL 1321 [1]; 1351 [1]; 1361 [2]; 2-20 Bergman on New York Mortgage Foreclosures § 20.03; Central Mtge. Co. v Acevedo, 34 Misc 3d 213, 220 [Sup Ct, Kings County 2011]; Mortgage Elec. Registration Sys., Inc. v Maki, 9 Misc 3d 983, 984-985 [Sup Ct, Seneca County 2005]), no statute and little case law deals with the settlement conference proceedings mandated by CPLR 3408 (a).
To the extent that the June 2011 order of reference authorizes the court attorney referees to “make procedural determinations regarding the qualifications of cases pending before them in the Residential Foreclosure Conference Part,” to supervise settlement discussions (i.e., “conference, negotiate, settle, [and] adjourn . . . cases pending before them”), and to “determine whether a mutually agreeable resolution to the foreclosure proceeding . . . can be reached at the mandatory conference stage,” it is more than arguable that these are “administrative rather than . . . judicial act[s] of the trial judge” (see Levenson v Lippman, 4 NY3d 280, 291 [2005]), within the “broad power to supervise the administration and operation of the Unified Court System” (see Matter of Met Council v Crosson, 84 NY2d 328, 334-335 [1994]) that the State Constitution gives to the Chief Judge, the Chief Administrative Judge, and their delegatees, including the appointed administrative judges in the various judicial districts (see NY Const, art VI, § 28; Levenson v Lippman, 4 NY3d at 289-291).
In any event, to the extent that these matters and the authority to direct to a judge any question as to the good faith participation of any party in mandated settlement proceedings, which necessarily involves the determination that particular settlement conference proceedings are mandated (see Goldstein v Sokel, 194 AD2d 518, 519 [2d Dept 1993]; see also Bimbalas v Margaritis, 224 AD2d 756, 757 [3d Dept 1996]; Laquidara, Inc. v Van Buskirk Bldrs., 87 AD2d 711, 711 [3d Dept 1982]), are deemed the subject of a reference to hear and report (see CPLR 4001, 4201, 4311), the reference is warranted by the “exceptional condition” (see CPLR 4212) presented by the foreclosure crisis. In the absence of the reference, the mandated settlement conferences would have led to “terrible calendar congestion” (see In re E. & S. Dists. Asbestos Litig., 129 FRD 434, 435 [ED NY 1990]), and a “large expenditure! ] of court resources which are in short supply and are required for other purposes” (see In re New York County DES Litig., 142 FRD 58, 60 [ED NY 1992]).
The foreclosure crisis, moreover, spawned legislation and homeowner-assistance programs on the federal and state levels, *894 which present complex legal and factual issues that benefit from the expertise of the special referees, and which further warrant the reference to hear and report (see CPLR 4212; Walter v Walter, 38 AD3d 763, 765 [2d Dept 2007]). “The referee’s function is to apply his expertise to the resolution of complicated issues of fact, or to apply complicated principles of law in resolving disputed facts.” (Glass v Thompson, 51 AD2d 69, 73 [2d Dept 1976].)
The court notes that, although most of the settlement conference proceedings took place before the issuance of the June 2011 order of reference, the July 8, 2011 report and recommendation was made at this court’s direction at the June 27, 2011 appearance before it, and that the July 13, 2012 supplemental report and recommendation was made, after further proceedings before the Special Referee, at the court’s direction in its October 2011 decision and order. In any event, neither party objected to the original reference to the Mandatory Foreclosure Conference Part in May 2009, the reference on June 27, 2011 for Special Referee Goldstein’s report as to plaintiffs alleged lack of good faith, or to the reference in the October 3, 2011 decision and order for Special Referee Goldstein’s report as to defendant McKenna’s residency. (See Matter of Wolf v Assessors of Town of Hanover, 308 NY 416, 420 [1955]; Matter of Union Indem. Ins. Co. of N.Y., 67 AD3d 469, 471 [1st Dept 2009]; 587 Dev., Inc. v Pizzuto, 8 AD3d 5 [1st Dept 2004].)
The questions then become, first, whether Special Referee Goldstein’s finding that the settlement conference proceedings in this case were mandated by CPLR 3408 (a), so as to impose on the parties the obligation to negotiate “in good faith to reach a mutually agreeable resolution” (see CPLR 3408 [f]), should be confirmed or rejected; and, if confirmed, whether her finding that plaintiff failed to participate in good faith should be confirmed or rejected, and, if confirmed, the appropriate remedy.
“Although the court is entitled to reject the report of a referee and make new findings . . . , the report and recommendations of a referee should be confirmed if his or her findings are supported by the record.” (Galasso, Langione & Botter, LLP v Galasso, 89 AD3d 897, 898 [2d Dept 2011]; see also Zupa v Keitt, 84 AD3d 792, 794 [2d Dept 2011] [“substantially supported by the record”]; MacNiallias v Potter, 82 AD3d 718, 719 [2d Dept 2011]; Varriano v Steering Wheel Rentals, Inc., 73 AD3d 756, 756-757 [2d Dept 2010]; Royal & Sun Alliance v *895 New York Cent. Mut. Ins. Co., 29 AD3d 886, 887 [2d Dept 2006]; Capili v llagan, 26 AD3d 354, 354 [2d Dept 2006] [“substantially-supported by the record”]; Slater v Links at N. Hills, 262 AD2d 299, 299 [2d Dept 1999]; Prater v Lavine, 229 AD2d 564, 564 [2d Dept 1996].) The referee’s findings are particularly entitled to deference where credibility is at issue, since the referee has the opportunity to see and hear the witnesses. (See Galasso, Langione & Botter, LLP v Galasso, 89 AD3d at 898; Perez v Fiore, 78 AD3d 1143, 1144 [2d Dept 2010]; Slater v Links at N. Hills, 262 AD2d at 299; Prater v Lavine, 229 AD2d at 564.)
Mandatory Settlement Conference/CPLR 3408 (a)
As previously noted, CPLR 3408 (a) mandates a settlement conference “[i]n any residential foreclosure action involving a home loan,” as the term “home loan” is defined in RPAPL 1304, “in which the defendant is a resident of the property subject to foreclosure.” The term “home loan” is defined as:
“ ‘Home loan’ means a loan, including an open-end credit plan, other than a reverse mortgage transaction, in which:
“(i) The borrower is a natural person;
“(ii) The debt is incurred by the borrower primarily for personal, family, or household purposes;
“(iii) The loan is secured by a mortgage or deed of trust on real estate improved by a one to four family dwelling, or a condominium unit, in either case, used or occupied, or intended to be used or occupied wholly or partly, as the home or residence of one or more persons and which is or will be occupied by the borrower as the borrower’s principal dwelling; and
“(iv) The property is located in this state.” (RPAPL 1304 [5] [a].)
When CPLR 3408 (a) and RPAPL 1304 (5) (a) are read together, it appears that a settlement conference will be mandated where two “residency” requirements are met, one considered as of the time the subject mortgage is given, and one considered as of the time the foreclosure action is commenced. Under this reading, although the borrower need not reside at the property when the mortgage is given if the property “is or will be occupied by the borrower as the borrower’s principal dwelling” (see RPAPL 1304 [5] [a] [iii]), a conference is only mandated where the borrower “is a resident of the property *896 subject to foreclosure” (see CPLR 3408 [a]) when the foreclosure action is commenced.
At least two trial courts have rejected this reading of CPLR 3408 (a). (See One W. Bank, FSB v Greenhut, 36 Misc 3d 1205[A], 2012 NY Slip Op 51197[U], *4 [Sup Ct, Westchester County 2012]; Accredited Home Lenders, Inc. v Hughes, 22 Misc 3d 323, 326-327 [Sup Ct, Essex County 2008].) These courts rely upon the definition of “home loan” in RPAPL 1304, which necessarily is applied at the time the loan is obtained and necessarily speaks of intention and future occupancy, buttressed by an assumed legislative intent “to remove owners of investment properties or second homes from the ambit of the statute, not to require a homeowner to remain at the mortgaged premises even as a foreclosure action is being prepared or pending.” (See One W. Bank, FSB v Greenhut, 2012 NY Slip Op 51197[U] at *4; Accredited Home Lenders, Inc. v Hughes, 22 Misc 3d at 326-327.) The language of CPLR 3408 (a) itself is not examined.
At least three trial courts, without discussing any question as to the meaning of CPLR 3408 (a), and implicitly placing the burden on the issue on the plaintiff mortgagee, have ruled that the evidence submitted was insufficient for a conclusion that a settlement conference was not mandated. (See Rossrock Fund II LB v Arroyo, 34 Misc 3d 1211[A], 2012 NY Slip Op 50048[U] [Sup Ct, Kings County 2012]; Butler Capital Corp. v Cannistra, 26 Misc 3d 598, 604-605 [Sup Ct, Suffolk County 2009]; Indymac Fed. Bank FSB v Black, 22 Misc 3d 1115[A], 2009 NY Slip Op 50133[U] [Sup Ct, Rensselaer County 2009]; see also One W. Bank, FSB v Greenhut, 2012 NY Slip Op 51197[U] at *4; Accredited Home Lenders, Inc. v Hughes, 22 Misc 3d at 326.)
“[T]he statutory text is the clearest indicator of legislative intent ... If the terms of the statute are clear and unambiguous, the court should construe it so as to give effect to the plain meaning of the words used . . . The objective of the court in this regard is to discern and apply the will of the Legislature, not the court’s own perception of what might be equitable.” (Maraia v Orange Regional Med. Ctr., 63 AD3d 1113, 1116 [2d Dept 2009] [internal quotation marks and citations omitted].)
However, “a statute’s language need not be ‘literally or mechanically applied’ when to do so ‘would cause an anachronistic or abused result.’ ” (People v Paulin, 17 NY3d 238, 243 [2011], quoting Doctors Council v New York City Employees’ Retirement Sys., 71 NY2d 669, 675 [1988].)
*897 This court can easily agree that the “plain language” of the definition of “home loan” found in RPAPL 1304, which requires that specified notices be given to the borrower prior to commencement of a foreclosure action, includes intention and future occupancy in the determination of residency. (See One W. Bank, FSB v Greenhut, 2012 NY Slip Op 51197[U] at *4.) But the controlling language for present purposes is found in CPLR 3408, i.e., “in which the defendant is a resident of the property subject to foreclosure” (see CPLR 3408 [a] [emphasis added]). The quoted language qualifies the incorporated definition of “home loan,” again determined at the time the mortgage is given, for purposes of a determination made after a foreclosure action is commenced as to whether a settlement conference should be mandated. The legislature’s presumed intent for that purpose might well be limited to attempting to keep people in their homes, which is not furthered by diverting limited resources to people who, for reasons unrelated to the foreclosure, are no longer, or perhaps never were, “a resident” of the property.
This reading of the statute is supported by Kings County Supreme Court Uniform Civil Term Rules, part F, rule 7, relied upon by Special Referee Goldstein, which provides:
“Every affidavit for an exemption from a conference made pursuant to CPLR 3408 and RPAPL 1304 must specify the grounds for same and provide supporting documentation and affidavits from persons with direct knowledge. Where the claim is that the borrower is not living in the subject house, then an affidavit of investigation substantiating this allegation must be appended which states inter alia that the borrower is not living in the house and that no action by the mortgagee or its agents procured same. This affidavit shall be included in the motion for a Judgment of Foreclosure and Sale.”
The words “is not living in the subject house” do not appear to this court to be in any way ambiguous, and are consistent with the statutory language, “is a resident of the property.”
The meaning of “residency” for purposes of CPLR 3408 (a) must yet be determined. In this case, however, that determination would be unnecessary were the court to accept Special Referee Goldstein’s alternative contention that plaintiffs failure to submit affidavits and documentation that would comply with the just-quoted rule in effect waived any claim that CPLR 3408 *898 (f) does not apply, or that plaintiff is judicially “estopped” from challenging the application of CPLR 3408 (f) by reason of plaintiff’s participation in foreclosure settlement conference proceedings.
“Generally and excepting instances where there would be transgressions of public policy, all rights and privileges to which one is legally entitled, ex contractu or ex debito justitiae, may be waived.” (Hadden v Consolidated Edison Co. of N.Y., 45 NY2d 466, 469 [1978].) “A waiver, the intentional relinquishment of a known right . . . , may be accomplished by express agreement or by such conduct or failure to act as to evince an intent not to claim the purported advantage.” (Id.)
First, assuming that the quoted rule was in effect at the commencement of this action, the rule by its terms speaks of “exemption from a conference” and not “exemption” from the “good faith” obligation imposed by CPLR 3408 (f). There is nothing about the failure to seek an exemption from a conference, or about participation in settlement conference proceedings, that evinces an intent to subject oneself to an enforceable obligation to act in “good faith” where the obligation would not otherwise exist. This would appear to be particularly true in Kings County where, immediately following the quoted rule, there is a rule that “[i]n addition to a conference mandated by statute, a conference will be ordered in every case when there is an appearance by the defendant owner of the equity of redemption” (see Kings County Sup Ct Uniform Civ Term Rules, part F, rule 8).
As articulated by the authority cited by Special Referee Gold-stein, “Under the doctrine of judicial estoppel, or estoppel against inconsistent positions, a party is precluded from inequitably adopting a position directly contrary to or inconsistent with an earlier assumed position in the same proceeding.” (See Maas v Cornell Univ., 253 AD2d 1, 5 [3d Dept 1999] [emphasis added], affd 94 NY2d 87 [1999].) The doctrine only applies where, as a result of the earlier assumed position, the party secured a judgment or some other favorable judicial action. (See Ferreira v Wyckoff Hgts. Med. Ctr., 81 AD3d 587, 588 [2d Dept 2011]; Angel v Bank of Tokyo-Mitsubishi, Ltd., 39 AD3d 368, 371 [1st Dept 2007]; Bono v Cucinella, 298 AD2d 483, 484 [2d Dept 2002].) There has been no judicial ruling accepting any contention by plaintiff that defendant McKenna “is a resident of the property subject to foreclosure” (see CPLR 3408 [a]).
The court finds and concludes that the record is sufficient to support the finding of Special Referee Goldstein that a settle *899 ment conference was required in this action pursuant to CPLR 3408 (a), such that the parties were each under an obligation pursuant to CPLR 3408 (f) to “negotiate in good faith to reach a mutually agreeable resolution,” whether the evidentiary burden on the issue is placed on the plaintiff mortgagee, as other courts have done (see One W. Bank, FSB v Greenhut, 2012 NY Slip Op 51197[U] at *3), or upon the defendant mortgagor, who might be in a better position to produce material evidence.
The court notes that neither CPLR 3408 nor RPAPL 1304 contains a definition of “residence” or “dwelling” for their respective or joint purposes, and neither plaintiff nor defendant McKenna nor Special Referee Goldstein has suggested that the term be given any meaning other than that commonly understood. For purposes of the Rent Stabilization Code, the term “primary residence” “is judicially construed as an ongoing, substantial, physical nexus with the premises for actual living purposes.” (See 68-74 Thompson Realty, LLC v McNally, 71 AD3d 411, 412 [1st Dept 2010] [internal quotation marks, ellipsis, and citations omitted].)
Defendant McKenna submitted his own affidavit, asserting that in March 2007, after separating from his wife, he purchased the mortgaged property at 448 Decatur Street in Brooklyn. He had lived with his wife at 65 Ontario Road in Bellerose. The Decatur Street property is a three-unit residential building, which Mr. McKenna purchased subject to existing tenancies in all units. He asserts that, although he “always intended to move into the first floor apartment” (see aff If 4), he did not obtain possession of the apartment until December 2008. After making extensive necessary repairs, he moved into the first floor unit in January 2009, approximately three months prior to commencement of this action. From November 2009 through November 2010, he spent weekends with his wife at the Bellerose house, “with the goal of reconciling our differences,” and moved back into the Bellerose house in December 2010. Mr. McKenna also submitted copies of his federal tax returns for 2009 and 2010, and his state tax return for 2010, each of which shows his address at the Decatur Street property.
Plaintiff submitted copies of defendant McKenna’s federal tax returns and W-2 wage and tax statements for 2007 and 2008, and a W-2 for 2009 (for $115.86); three bank statements from 2009 and three from 2010; and an earnings statement from 2009; all of which show McKenna’s address at Ontario Road in Bellerose. Plaintiff also relies on its process server’s affidavit of *900 service dated March 18, 2009, purporting to establish service on Mr. McKenna pursuant to the “nail and mail” provisions of CPLR 308 (4) at the Ontario Road address, and which further asserts that the process server confirmed that the address was Mr. McKenna’s residence with “Mr. Cavichi, white male, 70-80 years old, at 63 Ontario Road.” Mr. McKenna disputes proper service in his answer, and in his affidavit asserts that he “did not have confidence in forwarding [his] personal information to [his] house” on Decatur Street (see aff 1Í 8).
Considering “residency” as a component of the definition of “home loan,” there is no evidence in the record to contradict defendant McKenna that, at the time the loan was obtained, the mortgaged property was “intended to be used or occupied wholly or partly, as [his] home or residence . . . and [would] be occupied by [him] as [his] principal dwelling” (see RPAPL 1304 [5] [a] [iii]). The tax returns and W-2 statements for 2007 and 2008 merely confirm what Mr. McKenna acknowledges, i.e., that he did not occupy the Decatur Street building until December 2008. There is no evidence to contradict Mr. McKenna’s assertions in explanation about his inability to obtain possession from the tenants and the necessity of repairs. Special Referee Goldstein was entitled to accept Mr. McKenna’s testimony on these matters.
Considering “residency” at the time of commencement of the action, the only evidence that would undermine defendant Mc-Kenna’s assertions that he occupied the Decatur Street building from January 2009 until December 2010, except for weekends during the period November 2009 through November 2010, are the bank and earnings statements that show the Ontario Road address. Mr. McKenna offered an explanation that is plausible on its face, particularly in light of his weekend access to mail at that address, and Special Referee Goldstein was entitled to credit it.
Although evidence on these matters would be more available to defendant McKenna, and there was no formal disclosure during the settlement conference proceedings, Mr. McKenna provided documentation at plaintiffs request. Plaintiff does not assert that it was in any way hindered in obtaining information on these matters from Mr. McKenna. If a mortgagee applies for an “exemption” from settlement conference proceedings on the ground that the mortgagor is “not living in the subject house,” it is required to submit “an affidavit of investigation substantiating this allegation.” (See Kings County Sup Ct Uniform Civ *901 Term Rules, part F, rule 7.) No less should be required here. The process server’s conversation with a person at a neighboring address in Bellerose does not qualify.
This action was commenced in March 2009, and referred for settlement conference proceedings in May 2009. The parties appeared in the conference part 14 times from May 2009 through December 2010, and four times in 2011 until the action was referred to this court in May 2011. Special Referee Goldstein was given sufficient opportunity to assess Mr. McKenna’s credibility.
The only remaining question on this point is whether Mr. Mc-Kenna’s departure from the Decatur Street building in December 2010 to reconcile with his wife, which he readily acknowledges, affects the “good faith” obligation imposed by CPLR 3408 (f). The short answer would be that the determination of residency for purposes of CPLR 3408 (a) is made at the commencement of the action, and there is nothing in the statute to suggest that it is subject to redetermination. (See One W. Bank, FSB v Greenhut, 2012 NY Slip Op 51197[U] at *4; Accredited Home Lenders, Inc. v Hughes, 22 Misc 3d at 326-327.) In this case, moreover, the Special Referee’s report and recommendation dated July 8, 2011 relies only on events prior to December 2010 as the basis for the Special Referee’s determination that plaintiff did not negotiate in good faith.
“Good Faith” Negotiation/CPLR 3408 (f)
In her report and recommendation, Special Referee Goldstein concluded:
“During more than thirteen (13) settlement conferences, the Presumed Foreclosing Parties have failed to offer a reasonable explanation for their failure to accept the short sale offers and proceed with a reasonable alternative to foreclosure for all parties involved. In addition, the Presumed Foreclosing Parties’ utter disregard for the Legislature’s clear directive that in mandatory foreclosure settlement conferences ‘[b]oth the plaintiff and defendant shall negotiate in good faith to reach a mutually agreeable resolution ... if possible’ should not be condoned. N.Y.CPLR § 3408 (f).”
As Special Referee Goldstein explained elsewhere, the designation “Presumed Foreclosing Parties” reflects her uncertainty as to the real party in interest and the authority of *902 the persons who appeared for plaintiff during settlement conference proceedings. For present purposes, however, there is no contention that plaintiff is not fully bound by the conduct of those who appeared on its behalf.
Special Referee Goldstein’s determination that plaintiff did not negotiate in good faith, as required by CPLR 3408 (f), has both substantive and process aspects. The Special Referee charges that plaintiff refused to approve short-sale contracts reflecting “objectively-priced, market-driven, all cash offers for the property that were well within [plaintiffs] own appraised value in a declining market”; and that plaintiff “prolonged and ultimately frustrated the workout process, inflated Defendant’s original loan, . . . [and] caused the defense to unnecessarily incur attorney’s fees . . . for attending successive conferences during which [plaintiff] conducted a protracted short sale review.” (Report and recommendation at 2.) Further, that plaintiffs refusal to approve two proposed short-sale contracts was “without any reasonable explanation,” and accompanied by delaying requests for documents, and plaintiffs insistence on “unnecessary] . . . additional appraisals over the course of months.” (See id. at 3.)
It appears that, from the beginning of the settlement conference proceedings, the only resolution seriously contemplated by the parties was a short sale. Defendant McKenna listed the property in the summer of 2009, with an asking price of $499,000. As stated by the Special Referee, in July Mr. Mc-Kenna accepted an all cash offer of $325,000, which was the best offer received. In September, plaintiff obtained an appraisal of the property, which showed a “quick sale” value of the property at $315,000 and an “as is” market value of $350,000. The appraisal report noted that the real estate market in the area of Brooklyn in which the Decatur Street property is located was “oversaturrated and prices [were] falling sharply.” Plaintiff rejected the $325,000 contract and counteroffered at $340,000.
In December 2009, defendant McKenna presented plaintiff with a second short-sale contract, this one from a different prospective buyer, at the $340,000 price demanded by plaintiff. In the interim, Mr. McKenna had made repairs to the property, including a new boiler, totaling $15,000. The review process that followed included a further appraisal of the property in June 2010, six months later, that appraised the property at $412,000.
In an August 19, 2010 “directive,” Special Referee Goldstein states that in June 2010 plaintiff approved the short sale at *903 $340,000, but that plaintiff “has failed to allow short sale to proceed.” It appears from the report and recommendation that the $340,000 short-sale contract was in effect rejected at the conference in August 2010. Special Referee Goldstein considered that plaintiff had not followed through on commitments made at prior conferences, and scheduled further proceedings. Plaintiff obtained yet another appraisal in October 2010, showing market value at $520,000, and advised at a November conference that it would only accept a short sale that would “net $468,000” {see report and recommendation at 10).
Special Referee Goldstein’s report and recommendation includes as exhibits copies of the September 2009, June 2010, and October 2010 appraisal reports. Other than the “directive” dated August 19, 2010, the appraisals are the only exhibits.
At a scheduled hearing before this court, the parties were invited to respond to the findings and determinations of Special Referee Goldstein, and both parties did so. As will appear, however, to the extent that the parties’ respective submissions include factual assertions or documents that are not included or addressed in the report and recommendation, the evidentiary significance is suspect.
Defendant McKenna responded with a letter from his counsel, John E. Petiton, Esq., that contains factual assertions that are not affirmed to be true {see CPLR 2106). Of some note, Mr. Petiton states that in May 2011 a fourth appraisal of the subject property, obtained by Mr. McKenna, valued the property at $355,000. Plaintiff’s counsel acknowledges having received a copy of that appraisal at a May 25, 2011 conference. Neither party submits a copy of the appraisal, which is not referred to in Special Referee Goldstein’s report and recommendation. As noted above, the Special Referee’s findings and determinations as to plaintiff’s lack of good faith are based upon conduct through December 2010.
Plaintiff responded with an affidavit of Jessica Jones, described as “Vice President of Loan Doscumentation [sic] for Wells Fargo Bank N.A. . . . , which is the master servicer of the loan at issue”; and an affirmation of Michael Jablonski, Esq. in support of plaintiff HSBC Bank USA’s opposition to the recommendation of Deborah L. Goldstein, described as an associate with a law firm that is cocounsel for plaintiff. Both Ms. Jones and Mr. Jablonski attach as exhibits to their respective statements documents that are not included as exhibits to the report and recommendation. Moreover, Ms. Jones’s affidavit was exe *904 cuted in Maryland, and is not in admissible form (see CPLR 2309 [c]).
Neither Ms. Jones nor Mr. Jablonski asserts that she or he, respectively, either attended any of the settlement conferences or otherwise participated in plaintiffs consideration of defendant McKenna’s proposed short-sale contracts, nor does either otherwise establish personal knowledge of the matters asserted. Neither Ms. Jones nor Mr. Jablonski is named in the report and recommendation as participating in any way in settlement conference proceedings; neither name appears in any of the documents attached to Ms. Jones’s affidavit or Mr. Jablonski’s affirmation; and neither Ms. Jones nor Mr. Jablonski renders any of these documents admissible as evidence (see CPLR 4518 [a]).
Under these circumstances, the court will consider such documents only if they are addressed expressly or by implication by Special Referee Goldstein’s report and recommendation, or they undermine plaintiffs position on any issue. Having submitted the documents for this court’s consideration in its favor, plaintiff vouches for their authenticity, and must be bound by their significance. (See Wenger v DMR Realty Mgt., Inc., 90 AD3d 647, 648-649 [2d Dept 2011]; Ocampo v Pagan, 68 AD3d 1077, 1078 [2d Dept 2009]; Liberto v Liberto, 123 AD2d 669, 670 [2d Dept 1986] [“an exception to the hearsay rule for informal judicial admissions has been recognized in this State”].)
There appears to be no published decision that defines “good faith” for purposes of CPLR 3408 (f). A trial court has recently said that “the best uniform standard for ‘good faith’ is compliance with the Federal HAMP regulations.” (Flagstar Bank, FSB v Walker, 37 Misc 3d 312, 313 [Sup Ct, Kings County 2012].) The reference is to the Federal Home Affordable Modification Program “that arose out of the Emergency Economic Stabilization Act of 2008 and the Helping Families Save Their Homes Act ... of May of 2009.” (See JP Morgan Chase Bank, N.A. v Ilardo, 36 Misc 3d 359, 366 [Sup Ct, Suffolk County 2012].)
Requiring “good faith” participation in court-connected settlement conferences is not unique to mortgage foreclosure, and its complexity has been addressed by federal courts (see e.g. Negron v Woodhull Hosp., 173 Fed Appx 77 [2d Cir 2006]; In re A.T. Reynolds & Sons, Inc., 452 BR 374 [SD NY 2011]; Francis v Women’s Obstetrics & Gynecology Group, P.C., 144 FRD 646 [WD NY 1992]) and legal commentators based upon federal and *905 state law (see e.g. Thompson, 2010 Symposium: Codifying Mediation 2.0: Good Faith Mediation in the Federal Courts, 26 Ohio St J on Disp Resol 363 [2011]; Lande, Using Dispute System Design Methods to Promote Good-Faith Participation in Court-Connected Mediation Programs, 50 UCLA L Rev 69 [2002]; Alfini & McCabe, Mediating in the Shadow of the Courts: A Survey of the Emerging Case Law, 54 Ark L Rev 171 [2001]).
The Federal Rules of Civil Procedure require that parties and their counsel “participate in good faith” in court-ordered mediation (see rule 16 [f] [1] [b]). “Participation” for purposes of a consideration of “good faith” includes “the degree to which a party discusses the issues, listens to opposing viewpoints, analyzes its risk of liability, and generally participates in the ‘process’ of mediation” (see In re A.T. Reynolds & Sons, Inc., 452 BR at 381-382), and “is distinct from such objective criteria as attendance, exchange of pre-mediation memoranda, and settlement authority” (see id. at 382 n 2). “[A] party is not required to change its settlement parameters by reason of a court order to attend a settlement conference.” (Negron v Woodhull Hosp., 173 Fed Appx at 79 n.)
Generally, “good faith” under New York law is a subjective concept, “necessitating] examination of a state of mind.” (See Credit Suisse First Boston v Utrecht-America Fin. Co., 80 AD3d 485, 487 [1st Dept 2011], quoting Coan v Estate of Chapin, 156 AD2d 318, 319 [1st Dept 1989].) “ ‘Good Faith’ is an intangible and abstract quality with no technical meaning or statutory definition.” (Adler v 720 Park Ave. Corp., 87 AD2d 514, 515 [1st Dept 1982], quoting Doyle v Gordon, 158 NYS2d 248, 259 [Sup Ct, NY County 1954].) “It encompasses, among other things, an honest belief, the absence of malice and the absence of a design to defraud or to seek an unconscionable advantage.” (Doyle v Gordon, 158 NYS2d at 259-260; see also UCC 1-201 [19] [“ ‘Good Faith’ means honesty in fact in the conduct or transaction concerned”].) “Good faith is . . . lacking when there is a failure to deal honestly, fairly, and openly.” (Matter of CIT Group I Commercial Servs., Inc. v 160-09 Jamaica Ave. Ltd. Partnership, 25 AD3d 301, 303 [1st Dept 2006] [internal quotation marks and citation omitted]; see also Southern Indus. v Jeremias, 66 AD2d 178, 183 [2d Dept 1978].) “In New York, as elsewhere, ‘good faith’ connotes an actual state of mind — a state of mind motivated by proper motive.” (Polotti v Flemming, 277 F2d 864, 868 [2d Cir I960].) In the context of negotiations, the absence of agreement does not itself establish the lack of good *906 faith. (See Brookfield Indus. v Goldman, 87 AD2d 752, 753 [1st Dept 1982].)
Although no court has articulated a definition or conception of “good faith” for purposes of CPLR 3408 (f), either as a substantive determination as to the plaintiff mortgagee’s decision not to reach a resolution or as descriptive of the plaintiff mortgagee’s conduct during mandated settlement conference proceedings, a growing number of trial courts have found or suggested a lack of good faith on the part of the plaintiff mortgagee. (See Bank of Am. N.A. v Lucido, 35 Misc 3d 1211[A], 2012 NY Slip Op 50655[U], *7 [Sup Ct, Suffolk County 2012]; HSBCMtge. Corp. [USA] v Gigante, 2011 NY Slip Op 33327[U], *8-9 [Sup Ct, Richmond County 2011]; Deutsche Bank Trust Co. of Am. v Davis, 32 Misc 3d 1210 [A], 2011 NY Slip Op 51238[U], *2 [Sup Ct, Kings County 2011]; US Bank N.A. v Alejandra Padilla, 31 Misc 3d 1208[A], 2011 NY Slip Op 50535[U], *4 [Sup Ct, Dutchess County 2011]; BAC Home Loans Servicing v Westervelt, 29 Misc 3d 1224[A], 2010 NY Slip Op 51992[U] [Sup Ct, Dutchess County 2010]; Wells Fargo Bank, N.A. v Meyers, 30 Misc 3d 697, 700-701 [Sup Ct, Suffolk County 2010]; Emigrant Mtge. Co. Inc. v Corcione, 28 Misc 3d 161, 168-169 [Sup Ct, Suffolk County 2010]; Wells Fargo Bank, N.A. v Hughes, 27 Misc 3d 628, 634 [Sup Ct, Erie County 2010]; One W. Bank, FSB v Greenhut, 2012 NY Slip Op 51197[U] at *6.)
For the most part, findings of lack of good faith have been based upon descriptions of the plaintiff mortgagee’s conduct during mandated settlement conference proceedings. “Conduct such as providing conflicting information, refusal to honor agreements, unexcused delay, unexplained charges, and misrepresentations have been held to constitute ‘bad faith.’ ” (Flagstar Bank, FSB v Walker, 37 Misc 3d at 317 n 6; see also One W. Bank, FSB v Greenhut, 2012 NY Slip Op 51197[U] at *4-5.)
Some decisions, however, suggest a lack of good faith in the plaintiff mortgagee’s decision not to reach a resolution, in that the plaintiff mortgagee rejected a proposed short sale of the property (see HSBC Bank USA, N.A. v Cayo, 34 Misc 3d 850, 853 n 7 [Sup Ct, Kings County 2011]); or “failed to . . . extend to defendant an affordable loan modification” (see Deutsche Bank Trust Co. of Am. v Davis, 2011 NY Slip Op 51238[U] at *2); or failed to “work out a loan modification, as required by statute, with a homeowner who is gainfully employed” (see BAC Home Loans Servicing v Westervelt, 2010 NY Slip Op 51992[U] at *5); or “failed to demonstrate any good faith basis for refus *907 ing to honor the terms of the trial modification or offering another similar proposal” (see Wells Fargo Bank, N.A. v Meyers, 30 Misc 3d at 701); or “obstinately refusing to revise” the terms of a modification agreement “in accordance with the stated intention of the Legislature” (see Wells Fargo Bank, N.A. v Hughes, 27 Misc 3d at 634). Another court held, however, that “a determination not to modify a mortgage loan by a foreclosing bank that is under no legal obligation to modify such a loan . . . does not constitute bad faith.” (See JP Morgan Chase Bank, N.A. v Ilardo, 36 Misc 3d at 379-380.)
It is also not clear whether the plaintiff mortgagee or the defendant mortgagor bears the evidentiary burden on the issue of good faith where it is required by CPLR 3408 (f). (See One W. Bank, FSB v Greenhut, 2012 NY Slip Op 51197[U] at *7 [defendant mortgagor]; Deutsche Bank Trust Co. of Am. v Davis, 2011 NY Slip Op 51238[U] at *2 [plaintiff mortgagee].) It appears to this court, however, that, assuming fair access to material evidence on the issue, the burden should be placed on the party who seeks some judicial consequence from the determination, which in most cases would likely be the defendant mortgagor.
Although not directly on point, because they do not explicitly address the good faith requirement of CPLR 3408 (f), the opinions in IndyMac Bank F.S.B. v Yano-Horoski (26 Misc 3d 717 [Sup Ct, Suffolk County 2009], revd as to sanction 78 AD3d 895 [2d Dept 2010]) are informative. The trial court vacated a judgment of foreclosure and sale, cancelled the note and mortgage, and directed cancellation of the notice of pendency, based upon conduct of the plaintiff mortgagee during settlement conference proceedings that the court characterized as “inequitable, unconscionable, vexatious and opprobrious . . . wholly unsupportable at law or in equity, greatly egregious and . . . completely devoid of good faith . . . [and] harsh, repugnant, shocking and repulsive.” (See 26 Misc 3d at 724.) Among other cited conduct, the “[p]laintiff flatly rejected an offer by defendant’s daughter to purchase the house for its fair market value (a so-called ‘short sale’) with third-party financing,” and “each and every proposal by defendant, no matter how reasonable, was soundly rebuffed by plaintiff.” (See id. at 719.)
On appeal, without discussing the bases for the trial court’s actions, the Second Department reversed as to the sanction, holding that “the severe sanction ... of cancelling the mortgage and note was not authorized by any statute or rule . . . , nor was the plaintiff given fair warning that such a sanction was even under consideration.” (See 78 AD3d at 896.)
*908 “The reasoning of the [lower court] that its equitable powers included the authority to cancel the mortgage and note was erroneous, since there was no acceptable basis for relieving the homeowner of her contractual obligations to the bank . . . , particularly after a judgment had already been rendered in the plaintiffs favor.” (Id,.; see also Citibank, N.A. v Van Brunt Props., LLC, 95 AD3d 1158, 1159 [2d Dept 2012].)
Although judicial modification of the terms of the loan or mortgage may not be an appropriate remedy for a plaintiff mortgagee’s lack of good faith or other wrongful conduct, it does not follow that the plaintiff mortgagee’s refusal to modify such terms during mandated settlement conference proceedings cannot be considered in assessing whether the plaintiff mortgagee discharged the statutorily imposed obligation to negotiate in good faith (see CPLR 3408 [f]). Similarly, understandings of good faith in contractual or other transactional contexts generally, or as required as part of general court-ordered mediation programs, do not necessarily apply to limit the meaning of “good faith” where, as here, imposed to achieve a particular statutory purpose.
“The purpose of the good faith requirement [in CPLR 3408] is to ensure that both plaintiff and defendant are prepared to participate in a meaningful effort at the settlement conference to reach resolution.” (See L 2009, ch 507, Governor’s Program Bill Mem No. 46R at 6.) Since an unreasonable, arbitrary, or even unexplained, refusal to consider alternatives to foreclosure is not consistent with “meaningful effort” to reach resolution, substantive consideration of the plaintiff mortgagee’s action or inaction with respect to alternatives is consistent with, if not required by, the statutory purpose. Subjective good faith, moreover, or the lack thereof, can rarely be determined without examination of its likely “external manifestations.” (See Adler v 720 Park Ave. Corp., 87 AD2d at 515.)
In this context, “good faith” might be fairly analogized to the concept of “unconscionability,” which has both procedural and substantive elements. (See Emigrant Mtge. Co., Inc. v Fitzpatrick, 95 AD3d 1169, 1170 [2d Dept 2012].) A determination of “unconscionability” generally requires a showing as to both elements, although the elements “operate on a sliding scale.” (See Simar Holding Corp. v GSC, 87 AD3d 688, 690 [2d Dept 2011] [internal quotation marks and citation omitted].)
*909 Here, is not disputed that in August 2009 defendant Mc-Kenna presented plaintiff with the first of two proposed short-sale contracts. The court notes that plaintiff disputes the Special Referee’s statement that the proposed purchase price was $325,000, and that the residential contract of sale dated July 6, 2009 states a purchase price of $300,000, but also notes that a rider to that contract refers to a purchase price of $325,000. In any event, after appropriate deductions from the purchase price, plaintiff would have received $249,600 of a $300,000 purchase price, which plaintiff “deemed insufficient to yield Plaintiff a reasonable percentage of fair market value” (see aff of Jessica Jones 1Í1Í11, 13). The first proposal was promptly rejected.
As noted above, plaintiff obtained an appraisal of the property in September 2009 that showed a “quick sale” value of the property at $315,000 and an “as is” market value at $350,000. Plaintiff does not explain how it decided at this point the percentage of fair market value that it would deem “reasonable” and “sufficient.” At a later point, however, applying the guidelines of the Federal Home Affordable Foreclosure Alternative (HAFA) program, “Plaintiff determined that a minimal acceptable net proceeds for short sale approval is 85% of the fair market value” (see aff of Jessica Jones 1Í17). Using the “quick sale” value of $315,000, which seems appropriate since the short-sale offer was “all cash,” and since the appraisal stated that “the market ... is oversaturrated and prices are falling sharply,” 85% would be $267,750. Even assuming the $300,000 purchase price, plaintiff would have received $249,600; and plaintiff asserts that in October the offer was increased to $310,000 (see id. 1112).
“Plaintiff advised Defendant that a purchase amount of $340,000 would be needed to approve the sale of the Property at that time.” (See id.) At a settlement conference on November 16, 2009, “Defendant’s counsel advised Plaintiffs counsel that he had submitted a short sale offer for $340,000.00.” (See affirmation of Michael Jablonski, Esq. 11 7.) This second short-sale proposal, with a different prospective purchaser, is reflected in a residential contract of sale dated December 1, 2009, and was also an “all cash” transaction. By the end of 2009, therefore, defendant McKenna had in hand a contract for sale of the property at the amount demanded by plaintiff, which was $25,000 more than the “quick sale” appraisal value and only $10,000 less than full appraised market value.
It is important to note at this point that defendant McKenna’s procurement of a contract for purchase of the mortgaged *910 property at the price demanded by plaintiff obviates consideration of the facts that would otherwise be assessed and weighed in determining whether plaintiff lacked good faith in refusing to approve a short sale. Those factors would include the amount of the outstanding indebtness, which here, according to Special Referee Goldstein, was $684,000 at the time of the first settlement conference; the likely movement of the market, which here, according to the September 2009 appraisal, was sharply declining; and the likelihood of a greater yield through a private short sale than through a public foreclosure auction, considering both the expense and time associated with each. Neither Special Referee Goldstein nor either of the parties addresses this last factor.
The court has little difficulty concluding that, unless there is a good reason for the second proposed short-sale transaction not to have been formally approved by plaintiff and consummated, there is sufficient support in the record to support Special Referee Goldstein’s determination that plaintiff did not “negotiate in good faith to reach a mutually agreeable resolution” (see CPLR 3408 [f]). Nor, given the circumstances existing at the end of 2009, does the court hesitate in placing the burden on plaintiff to come forward with evidence of a good reason.
There is no doubt that after submission on January 13, 2010 of the second proposed short-sale contract “along with a financial package” (see affirmation of Michael Jablonski, Esq. 1i 7), the review and approval process sputtered and stalled. Special Referee Goldstein acknowledges in her report and recommendation that some delay during the first six months of 2010 was attributable to the newly promulgated HAEA program, with requirements for “the homeowner’s submission of additional paperwork on official Fannie Mae Treasury forms.”
Nonetheless, Special Referee Goldstein describes a “prolonged” and “protracted short sale review,” during which plaintiff “demanded multiple submissions of documents from the defense, unnecessarily insisted on two additional appraisals over the course of months,” and was “unable to support the basis for the delays in the extended review of the short sale contracts presented fro [sic] approval . . . and the basis of the increasing appraisals in the declining market in mid-2010.” Plaintiff disclaims any responsibility for the delay, which it suggests belongs to defendant McKenna and Special Referee Gold-stein.
The court finds sufficient support in the record for Special Referee’s characterization of plaintiff’s review and approval *911 process, which is not substantially undermined by plaintiff s own recitation of events, contained in its submissions in response. For example, whereas Ms. Jones states in her affidavit that “[p]laintiff did not receive another updated packet for review until March, 2010” (see aff of Jessica Jones 1Í14), the affirmation of its counsel states that, after receiving the second proposed short-sale package on January 13, 2010, it was not until March 12 that counsel’s office “requested] updated documents ... as the previously submitted documents . . . had expired” (see affirmation of Michael Jablonski, Esq. 1111 8, 9).
The June 2010 appraisal assigned an “As Is Quick Sale” value to the property of $325,000, and an “As Is Market Value” of $412,000. The proposed “all cash” short-sale contract price of $340,000, therefore, exceeded the “quick sale” value, and was only $10,200 less than the amount obtained by applying Ms. Jones’s 85% yield requirement to the $412,000 market value, i.e., $350,200. The court also notes Special Referee Goldstein’s finding that, after the September 2009 appraisal, defendant Mc-Kenna spent $15,000 in repairs to the property.
There is a dispute as to the status in mid-2010 of the second short-sale proposal. Ms. Jones at the least suggests that “Defendant was denied for a HAFA short sale” in June 2010 (see aff of Jessica Jones 1! 18), but counsel makes no mention of any denial at the time, and submits correspondence dated in July to defendant McKenna’s counsel “advis[ing] of the documents needed for HAFA review” (see affirmation of Michael Jablonski, Esq. 1Í1Í18, 19). In her August 19, 2010 “directive,” Special Referee Goldstein states that plaintiff “approved short sale w/ all cash buyer [at] price BPO quoted by bank representative, Justin Pagel,” but plaintiff “has failed to allow short sale to proceed since 6/10 approval by bank.”
Special Referee Goldstein directed plaintiff “to complete short sale review no later than 8/31/10 because it has failed to comply w/ HAFA guidelines and the time constraints therein.” As Special Referee Goldstein explained in the report and recommendation, the HAFA program “set certain time constraints and uniform structure for short sale and deed-in-lieu workouts.” Plaintiff did not comply, because it insisted on yet another appraisal that plaintiff maintained was “required ... to continue HAFA review of this loan” (see affirmation of Michael Jablonski, Esq. 1Í 23; aff of Jessica Jones 1i 20).
The October 2010 appraisal assessed the market value of the property at $520,000. Nothing in the record explains the more *912 than 26% increase in appraised market value during the four months from June 2010, when the property was said to have an “As Is Market Value” of $412,000, particularly in light of the statement in the June 2010 appraisal report, “Property Value Trend, because of higher lending standards, prices has [sic] declined.”
In any event, based upon the October 2010 appraisal, plaintiff advised defendant McKenna that “the sale must net $468,000 to the lender,” and when defendant failed to procure a short-sale contract that would comply with plaintiffs demand, “Defendant was denied for [a short sale] on November 18, 2010.” (See aff of Jessica Jones 1Í1Í 20, 21.)
The court finds no good reason in the record for plaintiffs failure to approve the second proposed short-sale contract, calling for an “all cash” purchase price of $340,000, so as to result in a transfer of title no later than February 28, 2010. In consequence, the court finds sufficient support in the record for Special Referee Goldstein’s determination that plaintiff failed to “negotiate in good faith” (see CPLR 3408 [f]) with respect to defendant McKenna’s second proposed short sale in failing to promptly approve the sale, in unnecessarily prolonging and delaying the review and approval process, and in obtaining successive appraisals that became the basis for increased demands, all without any showing that its conduct was likely to yield a higher net return through a delayed foreclosure sale.
Remedy for Failure to Negotiate in “Good Faith”
In her report and recommendation, Special Referee Goldstein recommends the following remedies for plaintiffs failure to negotiate in good faith during mandated settlement conference proceedings:
“(a) barring Plaintiff from collecting from Defendant any attorney’s fees or other legal costs incurred as a result of this action; (b) awarding Defendant reasonable attorney’s fees and other legal costs and disbursements associated with its participation in foreclosure conferencing; and (c) barring Plaintiff from collecting from Defendant any interest accrued on the loan since September 2009.”
In the absence of any notice to plaintiff that any additional or different remedy might be imposed (see IndyMac, F.S.B. v Yano-Horoski, 78 AD3d at 896), and given the novelty of the issues raised by the Special Referee’s report and recommendation, the *913 court will limit its consideration of remedy to those recommended by the Special Referee.
CPLR 3408 (f) specifies no remedy for a party’s breach of its duty to negotiate in good faith during settlement conference proceedings. Where a mortgagee has been found to breach the duty, courts have ordered that no interest be collected on the underlying loan, either from a date during the proceeding that would appear to correspond to the mortgagee’s breach (see US Bank N.A. v Alejandra Padilla, 2011 NY Slip Op 50535[U] at *4; BAC Home Loans Servicing v Westervelt, 2010 NY Slip Op 51992[U]) or from the date of the mortgagor’s default on the loan, and including a bar on attorney fees and costs (see Bank of Am. N.A. v Lucido, 2012 NY Slip Op 50655[U] at *8; Emigrant Mtge. Co. v Corcione, 28 Misc 3d at 170).
Generally, “[a] foreclosure action is equitable in nature and triggers the equitable powers of the court.” (Norwest Bank Minn., NA v E.M.V. Realty Corp., 94 AD3d 835, 836 [2d Dept 2012]; see also Notey v Darien Constr. Corp., 41 NY2d 1055, 1055-1056 [1977].) “In an action of an equitable nature, the recovery of interest is within the court’s discretion,” with the “exercise of that discretion . . . governed by the particular facts in each case, including any wrongful conduct by either party.” (Dayan v York, 51 AD3d 964, 965 [2d Dept 2008]; see also Norwest Bank Minn., NA v E.M.V. Realty Corp., 94 AD3d at 837; Preferred Group of Manhattan, Inc. v Fabius Maximus, Inc., 51 AD3d 889, 890 [2d Dept 2008]; Danielowich v PBL Dev., 292 AD2d 414, 415 [2d Dept 2002].) In an appropriate case, “equity requires the cancellation of any interest awarded to [the mortgagee] on the unpaid principal balance of the mortgage.” (See Norwest Bank Minn. NA v E.M.V. Realty Corp., 94 AD3d at 837; see also Citibank, N.A. v Van Brunt Props., LLC, 95 AD3d 1158, 1159 [2d Dept 2012] [“Supreme Court . . . erred in . . . declaring that the plaintiff is not entitled to any interest, penalties, or fees on the note from the date of default”].)
“It is well settled ‘that a mortgagor is bound by the terms of his [or her] contract . . . and cannot be relieved from his [or her] default ... in the absence of waiver by the mortgagee, or estoppel, or bad faith, fraud, oppressive or unconscionable conduct on the latter’s part.’ ” (Levine v Infidelity, Inc., 285 AD2d 629, 630 [2d Dept 2001], quoting Nassau Trust Co. v Montrose Concrete Prods. Corp., 56 NY2d 175, 183 [1982].) But “[t]he equitable remedy of foreclosure may be denied in order to prevent unconscionable overreaching by a mortgagee.” (European Am. Bank v Harper, 163 AD2d 458, 461 [2d Dept 1990].)
*914 It seems beyond argument that breach of a statutorily-imposed duty — here, the duty to negotiate in good faith of CPLR 3408 (f) — is wrongful conduct sufficient to affect the discretionary award of interest, as well as of a nature to warrant relieving a mortgagor of some consequence of default, although apparently not to the extent of cancellation of the loan and mortgage (see IndyMac Bank, F.S.B. v Yano-Horoski, 78 AD3d at 896). Likewise, it would appear indisputable that discretion and equity require that the appropriateness of the remedy be determined by the nature and effect of the breach.
Where, as here, the mortgagee’s lack of good faith consists of the failure to promptly approve and facilitate a short sale at the price demanded by the mortgagee, with the result that the sale is lost, a denial of interest from the date of the mortgagor’s default fits the mortgagee’s breach. Indeed, since the consummated short sale would have relieved the mortgagor of any further responsibility for the debt, even a denial of interest from the date of default does not fully compensate the mortgagor for the consequences of the mortgagee’s breach.
Similarly, a denial of attorney fees to the mortgagee as an element of damages for the mortgagor’s default would be sufficiently tailored to the mortgagee’s breach of duty in this case, consistent not only with the equitable nature of foreclosure, but with the court’s general supervisory authority over awards of attorney fees, whether allowed by statute or by contract. (See Matter of First Natl. Bank of E. Islip v Brower, 42 NY2d 471, 474 [1977]; Yonkers Rib House, Inc. v 1789 Cent. Park Corp., 63 AD3d 726, 726-727 [2d Dept 2009]; SO/Bluestar, LLC v Canarsie Hotel Corp., 33 AD3d 986, 987 [2d Dept 2006]; RAD Ventures Corp. v Artukmac, 31 AD3d 412, 414 [2d Dept 2006].)
That assumes, of course, that the mortgagee would be entitled to an award of attorney fees in the first place. “Since there is no statute in New York authorizing the recovery of an attorney’s fee in a mortgage foreclosure action, such a fee may only be recovered if it is contractually authorized.” (Neighborhood Hous. Servs. of N.Y. City, Inc. v Hawkins, 97 AD3d 554, 554 [2d Dept 2012].) Here, the mortgage dated March 27, 2007 contains no provision for recovery of attorney fees in a foreclosure action. A provision that “Lender may charge [the mortgagor] fees for services performed in connection with [the mortgagor’s] default, for the purpose of protecting Lender’s interest in the Property and rights under this Security Instrument, including but not limited to attorneys’ fees, property inspection and valu *915 ation fees” (section 14) does not qualify. (See Jamaica Sav. Bank v Cohan, 38 AD2d 841, 841-842 [2d Dept 1972].) Nor does the provision in the adjustable rate note that the lender “will have the right to get paid back by [the borrower] for all of its costs and expenses in enforcing this Note . . . including] . . . reasonable attorneys’ fees.” (See Vardy Holding Co. v Metric Resales, 131 AD2d 564, 565 [2d Dept 1987]; Lipton v Specter, 96 AD2d 549 [2d Dept 1983].)
Special Referee Goldstein’s recommendation that defendant McKenna be awarded attorney fees stands on different footing, as it calls for affirmative relief to the mortgagor, rather than an adjustment of the mortgagee’s equitable remedy. As Special Referee Goldstein recognizes with her citation to alternative authority, neither CPLR 3408 itself nor the law generally applicable to foreclosures provides for such an award to a mortgagor. Absent a proven counterclaim by a mortgagor for which an award of attorney fees may be made as damages, again either by statute or contract, the court can make such an award only to the extent permitted by statute or rule. (See Tewari v Tsoutsouras, 75 NY2d 1, 7 [1989] [dismissal of complaint not permissible sanction for failure to comply with CPLR 3406].)
Authority for an award of attorney fees to the mortgagor might be found in some cases in part 130 of the Rules of Chief Administrator of the Courts (see 22 NYCRR 130-1.1 et seq.), cited by the Special Referee. A court may award “costs in the form of reimbursement for actual expenses reasonably incurred and reasonable attorney’s fees, resulting from frivolous conduct as defined in [the] Part.” (See 22 NYCRR 130-1.1 [a].) “Frivolous” conduct is defined to include conduct “undertaken primarily to delay or prolong the resolution of the litigation.” (See 22 NYCRR 130-1.1 [c] [2].)
Assuming that a reference may even be made for the purpose of part 130, no such reference was made here. Although the court may sanction frivolous conduct “upon the court’s own initiative, after a reasonable opportunity to be heard” (see 22 NYCRR 130-1.1 [d]), the court declines to do so here, where none of the conduct upon which a sanction order would be based took place before the court. If so advised, defendant McKenna may move for the imposition of a part 130 sanction.
Finally, in her report and recommendation dated July 8, 2011, Special Referee Goldstein recommended that plaintiff make certain disclosures related to its “standing” to maintain this foreclosure action. Since, in his answer, defendant McKenna al *916 leges as an affirmative defense plaintiffs lack of “standing,” plaintiff will be required “to establish its standing to be entitled to relief’ (see Deutsche Bank Natl. Trust Co. v Rivas, 95 AD3d 1061, 1061 [2d Dept 2012]).
In sum, the court determines that in mandated settlement conference proceedings (see CPLR 3408 [a]) plaintiff failed to negotiate “in good faith to reach a mutually agreeable resolution” (see CPLR 3408 [f]), and as a consequence plaintiff may not recover interest on the subject note and mortgage from the date of the mortgagor’s alleged default.